IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

GW ACQUISITION CO., LLC,            )
                                    )
              Plaintiff,            )
                                    )
       v.                           )
                                    )
PAGELAND LIMITED LIABILITY CO., et al.,   )      REDACTED
                                    )            1:22-cv-255 (LMB/JFA)
              Defendants/Third-Party Claim   )
              Plaintiffs,           )
                                    )
       v.                           )
                                    )
MAGLANDBROKER, LLC, et al.,         )
                                    )
              Third-Party Defendants.    )

<u>MEMORANDUM OPINION</u>

Before the Court are four dispositive motions: Defendants Pageland LLC's and Barbara

Brower's Motion to Dismiss Plaintiff GW Acquisition Co., LLC's First Amended Complaint or,

in the Alternative, for Summary Judgment ("Sellers' First Motion") [Dkt. No. 122], Plaintiff GW

Acquisition, LLC's Motion for Summary Judgment ("Buyer's Motion") [Dkt. No. 127], Third-

Party Defendants' Motion for Summary Judgment ("Broker's Motion") [Dkt. No. 130], and

Third-Party Claim Plaintiffs Pageland LLC, Barbara Brower, and Jon Sanders Brower's Motion

for Summary Judgment as to Third-Party Defendants MagLandBroker, LLC and Mary Ann

Ghadban ("Sellers' Second Motion") [Dkt. No. 133].

For the reasons that follow, the Sellers' First Motion will be granted as to Counts II, III,

IV, VI, and VII of the First Amended Complaint and those counts will be dismissed, and the

motion will be denied in all other respects; the Buyer's Motion will be granted as to Counts I and

V of the First Amended Complaint and denied in all other respects; the Broker's Motion will be

granted as to the Third-Party Complaint; and the Sellers' Second Motion will be denied as to the Third-Party Complaint.

## I. BACKGROUND

This civil action concerns two disputes arising out of the Prince William County Digital Gateway Project ("PWC Digital Gateway Project"), which proposes to convert 2,100 acres of rural land around Pageland Lane in Prince William County into a data center corridor.  Plaintiff GW Acquisition Co., LLC ("plaintiff," "GWA," or "Buyer"), a developer involved in the PWC Digital Gateway Project, initiated this civil action against defendants Pageland Limited Liability Company ("Pageland LLC"), Barbara Brower, and Jon Sanders Brower ("Brower") (collectively, "defendants" or "Sellers") to force them to comply with their agreement to sell three parcels of land to the Buyer.[1]  The Sellers, in turn, brought a third-party suit against the broker who represented them in the sale, third-party defendants MagLandBroker, LLC ("MagLandBroker") and Mary Ann Ghadban ("Ghadban") (collectively, "third-party defendants" or "Broker").[2]

Despite the factual complexity and multiple legal issues involved in the disputes among the parties, the uncontested record reflects that these disputes boil down to a case of sellers' remorse.  Specifically, although the Sellers may regret agreeing to sell their land to GWA under a deal arranged by the Broker and foregoing a more lucrative offer, they cannot use this litigation

---

[1] All relevant actions by the Sellers were carried out by Jon Sanders Brower, because both Pageland LLC and Barbara Brower act through Brower, who serves as Pageland LLC's manager and as attorney-in-fact for Barbara Brower, with the power to manage and dispose of all her affairs and property due to her advanced age and mental incapacity.  [Dkt. No. 110] ¶¶ 2-3; [Dkt. No. 134] ¶ 3; [Dkt. No. 142] at 2.

[2] Because the Buyer and the Sellers are diverse and the amount-in-controversy exceeds $75,000, the Court has diversity jurisdiction over the Buyer's claims against the Sellers, and in turn has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over the Seller's third-party claims against the Broker.

to escape liability for breaching an otherwise enforceable sales contract with GWA and are not entitled to obtain millions of dollars from the Broker who negotiated the sales contract.

## A. **Factual Background**

Unless indicated otherwise, the following facts are undisputed and are based on the parties' Joint Pre-Trial Statement, in which they stipulated to uncontested facts, [Dkt. No. 110], as well as the facts drawn from the parties' statements of undisputed fact accompanying their respective motions for summary judgment.

### 1. The Sellers and Broker's Dispute

In 2019, Ghadban became interested in selling 55 acres of land that she owns along Pageland Lane in Prince William County to data center providers, which would require rezoning the area for data center development. [Dkt. No. 134] ¶¶ 4-5; [Dkt. No. 132] ¶¶ 1-2. Pageland Lane is part of a no-build zone known as the Rural Crescent, but it has immediate proximity to transmission and high-speed fiber lines, making the area a favorable site for data centers. [Dkt. No. 132] ¶ 1; [Dkt. No. 138] at 2. Given the zoning restrictions on the Rural Crescent, the development of data centers required a Comprehensive Plan Amendment ("CPA") approved by Prince William County. [Dkt. No. 132] ¶ 3; [Dkt. No. 138] at 2. Ghadban assembled multiple properties from neighbors around Pageland Lane to pursue a CPA and subsequent rezoning (the "assemblage"). [Dkt. No. 132] ¶¶ 3, 6; [Dkt. No. 134] ¶ 6.

Pageland LLC, a Virginia limited liability company managed by Brower, owns three parcels of land along Pageland Lane, totaling 131.789 acres (collectively, "Brower property"). [Dkt. No. 110] ¶ 4. On August 19, 2020, Brower entered into a Listing and Marketing Agreement ("Listing Agreement") with Ghadban for her to list and market the Brower property as part of the assemblage of properties she had put together. Id. ¶ 5; [Dkt. No. 134] ¶ 6; [Dkt. No. 142] at 4. Under the Listing Agreement, the assemblage was defined as "those certain

3

parcel[s] of real property consisting of approximately 529 acres owned by Snyder, Ghadban, Brower and Abul Husn [or "Aboulhosn"] who each own properties along Pageland Lane, and under all circumstances consist[s] of all of [the] parcels the purchaser . . . has agreed to purchase and rezone in accordance with the terms set forth above." [Dkt. No. 132-2] ¶ 5; [Dkt. No. 134-2] ¶ 5. Brower was represented throughout these transactions by counsel, Tim Purnell ("Purnell"), who reviewed the Listing Agreement before Brower signed it. [Dkt. No. 132] ¶ 4; [Dkt. No. 138] at 2; [Dkt. No. 132-9] at 20.

The Listing Agreement provided that the purchase price for the Brower property "shall be determined by a survey based on the asking price of not less than ████ per acre,[3] unless a signed consent is signed by Seller for the sale of the property." [Dkt. No. 132-2] ¶ 3(A); [Dkt. No. 134-2] ¶ 3(A). Under the Listing Agreement, Ghadban had the exclusive right to list and market the property and would be paid a commission of ██ of the final sales price "if she is working with another agent for the Purchaser" or ██ of the final sales price "if she is a dual agent with no other broker involved." [Dkt. No. 132-2] ¶ 2; [Dkt. No. 134-2] ¶ 2.

The Listing Agreement contained a conflict of interest provision, which disclosed that Ghadban owned property that was to be marketed as part of the assemblage. [Dkt. No. 132-2] ¶¶ 7, 11; [Dkt. No. 134-2] ¶¶ 7, 11. Specifically, paragraph 7 provided:

> It is hereby disclosed that Broker is also acting as the real estate broker for all of the other owners of parcels in the Assemblage, and as such, it is understood and disclosed that Broker has a financial interest in completing the sale of the entire Assemblage or as many parcels in the Assemblage as possible to the purchaser. It is further understood and disclosed that Broker has a substantial ownership interest in one or more parcels within the Assemblage, and intends to enter into a contract of purchase and sale for the sale of properties owned by Broker or in which Broker has an interest to the

---

[3] The Court permitted the parties to file under seal sensitive financial information and future deadlines which are not publicly available. See [Dkt. No. 99]. To maintain the confidentiality of this information, two versions of this memorandum opinion have been issued, a public version with the sealed material redacted, and an under seal version without redactions.

> purchaser of the Assemblage. Client hereby waives any conflict of interest and authorizes Broker to represent and serve as the exclusive agent and broker for all of the other owners of parcels within the Assemblage. Notwithstanding this wavier, the Broker shall seek to value Client's property as equivalent to all other Parcels in the Assemblage inasmuch as the assemblage required [sic] the full participation of all owners and all parcels.

[Dkt. No. 132-2] ¶ 7; [Dkt. No. 134-2] ¶ 7.  Ghadban ultimately signed listing and marketing agreements with other Pageland Lane landowners, resulting in a total assemblage of approximately 801 acres.  [Dkt. No. 132] ¶ 7; [Dkt. No. 138] at 3.

Around August 2020, Ghadban began contacting various data center users who she thought might be interested in acquiring the assemblage, [Dkt. No. 110] ¶ 6, and worked with Carter Wiley ("Wiley") as a co-broker to market the properties, [Dkt. No. 134] ¶ 10; [Dkt. No. 142] at 5.  Although Ghadban marketed all the properties in the assemblage together as part of one sale, at some point, she decided to divide the properties into two groups, known as Phase 1 and Phase 2, which are geographically separated.  [Dkt. No. 132] ¶ 9; [Dkt. No. 138] at 3.  Phase 1 included 15 parcels of land owned by Ghadban and 6 other individuals or entities and was offered at ███████ per acre, a higher price per acre than the Phase 2 parcels, which were offered at ██████ per acre and included 12 parcels of land owned by Brower, Aboulhosn, and 6 other individuals or entities.  [Dkt. No. 134-4], Ex. C; [Dkt. No. 132] ¶ 9; [Dkt. No. 138] at 3.

The Sellers dispute Ghadban's reasons for dividing the assemblage into two phases.  The Broker contends that the Phase 1 properties were offered at a higher price due to their proximity to water and sewer resources, whereas the Phase 2 properties, which were separated from the Phase 1 properties by two miles, were offered at a lower price because of higher development costs, including the need to build water, sewer, and pump stations, as well as the need to obtain rights of way from owners of the land located between Phase 1 and Phase 2 for water and sewer easements and for widening Pageland Lane from two to four lanes, all of which would require an

expensive and contentious CPA and entail substantial costs for the developer. [Dkt. No. 132] ¶ 9. The Sellers dispute this explanation, which they assert is based only on Ghadban's personal knowledge and word, and they call into question her motivations, namely that she sought to obtain a higher price for her own property at the expense of the Phase 2 properties. [Dkt. No. 138] at 3-4. The Sellers also point out that widening Pageland Lane would affect development costs for both Phase 1 and Phase 2, and that Ghadban's explanation about infrastructure costs is undermined by her admission that a substantial portion of her property in Phase 1 would be used for open space and parks. Id. Neither party presented any expert evidence addressing the valuation of these properties.

Although the Sellers and Broker dispute exactly when Ghadban disclosed the price differential between the Phase 1 and Phase 2 properties to Brower, it is undisputed that he was aware of the difference by February 2021, six months after signing the Listing Agreement. [Dkt. No. 132] ¶ 11; [Dkt. No. 132-9] at 30-31; [Dkt. No. 138] at 4.

In April 2021, Ghadban and Wiley proposed terms for the sale of an 812-acre assemblage to GWA, with Phase 1 consisting of approximately 342 acres, and Phase 2 consisting of approximately 470 acres.[4] [Dkt. No. 110] ¶ 7. On May 7, 2021, the Phase 1 and Phase 2

---

[4] In her answers to the Sellers' interrogatories, Ghadban states that she also discussed offers with other potential purchasers. For example, in November and December 2020, she had calls with CloudHQ, which was only interested in buying the properties in Phase 1. Between November 2020 through March 2021, she had discussions with Microsoft, which was also only interested in purchasing Phase 1 properties for which it offered a premium of ▓▓▓▓ per acre. Between November 2020 through June 2021, Ghadban offered the assemblage to the Peterson Companies for ▓▓▓▓ per acre for Phase 1 and ▓▓▓▓ per acre for Phase 2, to which the Peterson Companies counteroffered with ▓▓▓▓ per acre for Phase 1 and ▓▓▓▓ per acre for Phase 2. According to Ghadban, the Peterson Companies would not agree to using the properties only for data centers and would not agree to meet the CPA and rezoning timelines or to pay for that work during the study period. Ghadban rejected all of these offers. [Dkt. No. 134-19] at 57-58.

property owners filed a CPA with the Prince William County Planning Office.[5]  Id. ¶ 8.  Five

days later, on May 12, 2021, KLNB, LLC ("KLNB"), a broker working on behalf of prospective

purchaser Delaware Land, LLC and its president Chuck Kuhn ("Kuhn"), sent Ghadban a letter of

intent to purchase the Phase 1 and Phase 2 properties for $525,000 per acre and $325,000 per

acre[6] ("Kuhn Letter of Intent").  Id. ¶ 10.  The next day, Ghadban emailed the Kuhn Letter of

Intent, with only the identity of the potential purchaser redacted, to the assemblage sellers;

however, for unexplained reasons, Brower's copy of the letter was sent to the email address of

his wife, Penny Brower.[7]  [Dkt. No. 134] ¶ 16; [Dkt. No. 132] ¶ 15.

In that email, Ghadban pointed out the problems with the Kuhn Letter of Intent, which

offered a price that was ██████ below the price the assemblage sellers were seeking for their

respective properties.  [Dkt. No. 132] ¶ 17; [Dkt. No. 132-5]; [Dkt. No. 138] at 6.  Ghadban also

explained that Kuhn's proposed rezoning of the property to "M1, M2, or MT" was "too broad,

we are going for [d]ata [c]enters," which would entail a more narrow rezoning.[8]  [Dkt. No. 132]

---

[5] The May 7, 2021 CPA covered an area of 812 acres, but by July 20, 2021, when the CPA was initiated, a Prince William County supervisor had amended the CPA to expand the scope of the PWC Digital Gateway Project to 2,100 acres.  Buyers other than GWA have purchased land that is part of that expanded area.  See [Dkt. No. 134-12] at 212-13.

[6] Although the parties have redacted the prices offered by Kuhn in their summary judgment memoranda, the Joint Pre-Trial Statement, to which all parties have consented and on which they all rely in briefing summary judgment, is unredacted and discloses those prices.  See [Dkt. No. 110] ¶¶ 10, 12.  Because these figures have been publicly available since the Joint Pre-Trial Statement was filed on September 23, 2022, they are not redacted in this memorandum opinion.

[7] The Broker contends that the Kuhn Letter of Intent was sent to Penny Brower on behalf of her husband, [Dkt. No. 142] at 7, but Brower disputes that the email sent to his wife was intended for him, and in any case, he claims that he never saw it, [Dkt. No. 138] at 6.

[8] The Broker asserts that the scope of the rezoning request supported by a potential buyer was an important consideration for the assemblage, because the County had indicated that it was willing to consider replanning the no-build zoning designation in the Rural Crescent to permit only data center use, which would not create excessive traffic.  A broader rezoning, as Kuhn proposed, would not have that benefit. [Dkt. No. 132] ¶ 18.

¶ 18; [Dkt. No. 132-5]; [Dkt. No. 138] at 6.  In addition to these issues, Ghadban commented that "the biggest issue is we just filed for our CPA a week ago . . . it makes no sense to tie our hands to anyone until we get our CPA approved or at least get to where we have a [Board of County Supervisors] hearing date."[9]  [Dkt. No. 132-5]; [Dkt. No. 132] ¶ 20; [Dkt. No. 138] at 7.

Over the next few months, Ghadban continued to negotiate with Kuhn and KLNB.  [Dkt. No. 132] ¶ 21; [Dkt. No. 138] at 7.  Between June 23 and July 15, 2021, KLNB submitted revised offers for Phase 1 and Phase 2, raising the purchase price to $550,000 per acre and $350,000 per acre, respectively ("Updated Kuhn Letters of Intent").  [Dkt. No. 110] ¶ 12.  It is uncontested that Ghadban did not forward the Updated Kuhn Letters of Intent to any of the assemblage sellers, including Brower.[10]  [Dkt. No. 132] ¶ 21; [Dkt. No. 134] ¶ 32; [Dkt. No. 138] at 7-8; [Dkt. No. 142] at 11-12.

---

[9] The Broker contends that another critical problem with the Kuhn Letter of Intent was that it did not include a "not to exceed" closing date, meaning that Kuhn could "tie up the properties indefinitely without proceeding to a closing," and therefore the offer did not satisfy the timelines requirements that would be necessary to obtain County approval.  [Dkt. No. 132] ¶ 19.  The Sellers dispute that the Kuhn Letter of Intent did not include a "not to exceed" closing date or that it presented concerns that Kuhn could indefinitely tie up the properties, pointing out that the offer proposed closing on "a day selected by Purchaser and Seller that is not later than thirty (30) days following the successful re-zoning of the Property . . . ."  [Dkt. No. 138] at 6-7; [Dkt. No. 132-5] at 2.

[10] The Broker contends that she did not share the Updated Kuhn Letters of Intent with the assemblage sellers because the offers did not remedy "non-starter issues" that had been discussed in a Zoom meeting on May 14, 2021, when the assemblage sellers met to discuss the first Kuhn Letter of Intent and agreed that they were not interested in the Kuhn Letter of Intent "with those deal breaker issues."  [Dkt. No. 132] ¶¶ 20-21.  Other than Ghadban mentioning in her May 13, 2021 email, which circulated the Kuhn Letter of Intent, that the group would meet for a "[Z]oom call Friday 6pm to discuss this is [sic] greater detail," [Dkt. No. 132-5], the only evidence in the record of a May 14, 2021 meeting is Ghadban's recollection of the meeting as recounted in her affidavit, [Dkt. No. 132-1] ¶ 25.  The Sellers dispute that a Zoom meeting took place on May 14, 2021, and that there was any consensus among assemblage sellers after the purported meeting, [Dkt. No. 138] at 7; however, they have not produced evidence from any other property owner contradicting Ghadban's statements about the meeting.  The Sellers also assert that subsequent Kuhn offers addressed the assemblage sellers' concerns, including offering a higher purchase

On July 25, 2021, Ghadban emailed the assemblage sellers, including Brower, a Confidential Update disclosing that Ghadban had been negotiating with a different data center user, plaintiff GWA, which had responded with a counteroffer of ▮▮▮▮ and ▮▮▮▮ per acre for Phase 1 and Phase 2. [Dkt. No. 132] ¶ 22; [Dkt. No. 132-6] at 1, 7; [Dkt. No. 138] at 8. Ghadban's email also included a proceeds analysis which showed that the purchase price for the Brower property would be approximately ▮▮▮▮▮▮ [Dkt. No. 132] ¶ 23; [Dkt. No. 132-6] at 12; [Dkt. No. 138] at 8.

On August 21, 2021, by a Letter of Intent, GWA offered to purchase the Phase 1 and Phase 2 properties for ▮▮▮▮ per acre and ▮▮▮▮ per acre, respectively ("GWA Letter of Intent"). [Dkt. No. 110] ¶ 13; [Dkt. No. 132-7]; [Dkt. No. 134-8]. The GWA Letter of Intent provided that GWA's obligation to close on the purchase was contingent on the County's approval of the CPA and rezoning. [Dkt. No. 134-8] at 3-4; [Dkt. No. 132-7] at 3-4. The GWA Letter of Intent stated that it was to be confidential but "does not constitute[] a binding agreement," except for the provisions on exclusivity, confidentiality, and expenses. [Dkt. No. 134-8] at 10; [Dkt. No. 132-7] at 10. The offer would expire if a purchase and sale agreement was not signed within 60 days; however, during that 60-day period, the parties were to "negotiate exclusively and diligently with one another in good faith with the intent to reach a mutually satisfactory agreement." [Dkt. No. 134-8] at 1-2; [Dkt. No. 132-7] at 1-2. The GWA Letter of Intent also provided that "[a]ll Sellers will donate ▮▮▮▮ per acre at settlement from their net proceeds to the Pageland Philanthropic Foundation." [Dkt. No. 134-8] at 10; [Dkt. No. 132-7] at 10. On August 22, 2021, Brower, who was represented by counsel, Purnell, signed the

---

price, cash at closing, a signing bonus, the same rezoning application timeline, and an earlier rezoning approval timeframe than GWA. Id. at 7-8.

Letter of Intent.  [Dkt. No. 132] ¶¶ 24-25; [Dkt. No. 138] at 8; [Dkt. No. 110] ¶¶ 14-15.  GWA

countersigned the letter on August 29, 2021, meaning that the 60-day period in which a purchase

and sale agreement had to be executed expired on October 28, 2021.  [Dkt. No. 132] at 8 n.2;

[Dkt. No. 132-7] at 11; [Dkt. No. 134-8] at 11.

It is undisputed that eight days after Brower signed the GWA Letter of Intent, he first

learned of the terms of the Updated Kuhn Letters of Intent, which included a higher price of

$350,000 per acre for the Phase 2 properties, when a KLNB broker contacted him on August 30,

2021 about Kuhn's offers.  [Dkt. No. 134] ¶¶ 31-32; [Dkt. No. 132] ¶ 26; [Dkt. No. 142] at 11-

12.  As a result, on September 7, 2021, Brower met with Ghadban and Wiley to discuss the Kuhn

proposal.  [Dkt. No. 132] ¶ 27; [Dkt. No. 138] at 8.  Ghadban secretly recorded the meeting,

which lasted over an hour.[11]  [Dkt. No. 132] ¶ 27; [Dkt. No. 138] at 8; [Dkt. No. 138-3].  The

recording establishes that Brower was surprised and upset not to have learned of the Kuhn offer

earlier, as he stated, for example, "why did I have to stumble across this . . . I felt you shoulda

[sic] brought it to me. . . . [w]e could contrast and comparison, and g[e]t down to the end and

say this is the better deal," [Dkt. No. 138-3] at 3-4, and "when I caught wind of this, I was kinda

miffed that this wasn't brought [to me]," id. at 16.  Ghadban, who was obviously upset during

the conversation, told Brower that he "should sell to [Kuhn]" and "[l]et them f**k you, and then

_____

[11] The Sellers' have attached a number of exhibits to their opposition to the Broker's Motion,
such as the transcript of Ghadban's recording, for which they have included the nonsensical
statement in a footnote that the exhibit is "not offered for the truth of the matter asserted; rather it
is offered to show the absence of admissible evidence" and that they "otherwise maintain their
Fed. R. Evid. 403, 802, and 901 objections to the use of this document at trial." [Dkt. No. 138]
at 9 n.5.  See [Dkt. No. 138] at 5, 10 & nn. 2, 3, 6, 8.  Because the Sellers have produced these
exhibits in opposing the Broker's Motion, the Court finds that it is appropriate to rely on them in
evaluating the pending motions for summary judgment.

Additionally, during oral argument on November 9, 2022, the Court requested a copy of
the audio recording, which the Broker's counsel has provided to chambers.  The Court has
considered that recording in evaluating the parties' motions.

you call me crying because I'm not gonna [sic] sell to them," id. at 11, and complained that

Kuhn was "just trying to f**king tie us up right now," id. at 13.  Ghadban and Wiley also

explained to Brower that the Kuhn offer had several problems, which is why they did not send

the Updated Kuhn Letters of Intent to the assemblage sellers, and expressed concerns about

working with Kuhn.  [Dkt. No. 132] ¶ 28; [Dkt. No. 138] at 9; see [Dkt. No. 138-3].

Toward the end of the meeting, Ghadban apologized for not showing the Updated Kuhn

Letters of Intent to Brower, stating she was "very sorry . . . [i]t's no good . . . I don't know what

else to say," to which Brower responded: "That's fine.  I mean, you gotta [sic] understand where

I'm coming from.  When my attorney says it looks the same, . . . and then I'm like, well then

why, why wasn't this being entertained if they were so close?  The terms were better."  [Dkt. No.

138-3] at 53-54.  Ghadban asked Brower, "I just wanna [sic] know how you wanna [sic] go from

here," and Brower said he would talk to his brother.  Id. at 69.  Ghadban then said to Brower,

"And if you stay with us, then . . . [y]ou just gotta stop talking to these other people because we

don't want everybody knowing what our deals are. . . . You just (laughs) gotta be happy with it.

Either be happy or, or get out."  [Dkt. No. 138-3] at 69.  Brower responded, "Fair enough.  I

mean, yeah.  That's fair enough.  Can't complain about that," after which Ghadban replied,

"[A]nd if you get out, you get out.  I mean, it's no hard feelings."  Id.

The next day, Brower emailed another Phase 2 seller, Hisham Aboulhosn, who had

followed up on Brower's earlier attempt to contact him.  [Dkt. No. 132] ¶ 32; [Dkt. No. 138] at

9-10.  Brower wrote: "[s]omething came up I thought you should know about regarding sale of

property, [I] sat down with Maryann [sic] and Carter got it explained to me turned out it was not

what I thought so dis regard [sic] if you do have question you can call me[.]"  [Dkt. No. 138-4].

On September 10, 2021, Ghadban, Wiley, Brower, and another Phase 1 seller met with Kuhn and KLNB to discuss the Updated Kuhn Letters of Intent. [Dkt. No. 132] ¶ 34; [Dkt. No. 138] at 10. Ghadban secretly recorded that meeting as well.[12] [Dkt. No. 138-6]. During the meeting, Ghadban discussed the problems she perceived with the Updated Kuhn Letters of Intent when compared to the GWA Letter of Intent, and she requested a "best and final" offer from Kuhn. [Dkt. No. 132] ¶ 35; [Dkt. No. 138] at 10; [Dkt. No. 138-6] at 20. Ghadban told Kuhn that "we're now going to do competitive bidding. . . . We're going to go back to our buyer that we've all signed [with], and said [sic] we want your best and final," after which Brower added, "I think we owe it to them."[13] [Dkt. No. 138-6] at 20.

One week later, Ghadban received a revised letter of intent from Kuhn ("Final Kuhn Letter of Intent"), which she forwarded to the assemblage sellers, including Brower, and on September 18, 2021, she emailed them her comparative analysis showing the differences between the Final Kuhn Letter of Intent and the GWA Letter of Intent. [Dkt. No. 132] ¶ 38; [Dkt. No. 134] ¶ 33; [Dkt. No. 134-14]. Ghadban's comparison indicated that Kuhn was offering ███████ more per acre than GWA for both Phase 1 and Phase 2,[14] but advised that "[t]he devil is in the details" and the GWA terms were more favorable. [Dkt. No. 134-14] at 2-3; [Dkt. No. 134] ¶ 33; [Dkt. No. 132] ¶ 38. For example, she highlighted that Kuhn was still adamant

---

[12] After oral argument on November 9, 2022, the Broker's counsel also provided a copy of that audio recording to the Court.

[13] The transcript of the meeting reflects that Brower participated in the conversation. See, e.g., [Dkt. No. 138-6] at 11, 18-19. For example, when another seller mentioned that Brower was going to a meeting "to hear about ███████ an acre offer," Brower responded, "I'm just going for the entertainment factor." Id. at 11.

[14] The Sellers point out that, in addition to a higher purchase price, the Final Kuhn Letter of Intent offered attractive terms, such as cash at closing and a signing bonus, as well as the same rezoning application timeframe and an earlier rezoning approval timeframe compared to the GWA Letter of Intent. [Dkt. No. 134] ¶ 33; [Dkt. No. 142] at 12.

about broader rezoning terms, which would conflict with the Board of Supervisors' view that the Pageland development be limited to a data center corridor; that Kuhn wanted to use a different zoning attorney and engineer; and that her experience negotiating with Kuhn showed that "the next two years with him will be all about him bullying and attempting to intimidate us constantly." [Dkt. No. 134-14] at 3-4.

Under the GWA Letter of Intent, the deadline for the Sellers to sign a final purchase and sale agreement was October 28, 2021. It is undisputed that between September 18, 2021, and October 27, 2021, Brower considered whether to sign a binding contract with GWA and consulted with third parties about how to proceed. [Dkt. No. 132] ¶ 41; [Dkt. No. 138] at 11. For example, in his deposition, Brower testified about emails that he exchanged with Aboulhosn, in which they discussed the Final Kuhn Letter of Intent. See [Dkt. No. 132] ¶¶ 39-40; [Dkt. No. 132-9] at 204-14; [Dkt. No. 138] at 10-11. Specifically, on September 18, 2021, after Brower forwarded Aboulhosn the Final Kuhn Letter of Intent, Aboulhosn replied that he was meeting with Ghadban on Monday to discuss the Final Kuhn Letter of Intent. [Dkt. No. 132-9] at 204-05. That same day, Brower responded to Aboulhosn that the offer was from the group which he had met with on September 10, 2021, i.e., Kuhn, and said, "I like this offer better, more per acre paid in full at closing. I am meeting Mary Ann and Carter Monday afternoon. If she pushes the first [Letter of Intent]," i.e., the GWA Letter of Intent, "I think I will defect the group. Let me know how it goes Monday. Thanks."[15] Id. at 206-07. The next day, Brower wrote to Aboulhosn, "If [Ghadban] reaches out to you about the two [letters of intent], tell her you don't want to wait

---

[15] The Sellers do not dispute that these email exchanges occurred; they only deny the Broker's "characterization" of Brower's emails. [Dkt. No. 138] at 10-11.

four years. You will only except [sic] cash at settlement," to which Aboulhosn responded, "Yes." Id. at 208-09; [Dkt. No. 138] at 11.

Separately, on September 20, 2021, Brower forwarded a redlined version of GWA's proposed purchase and sale agreement to Shivon Dosky ("Dosky"), a developer who had also seen the Final Kuhn Letter of Intent. [Dkt. No. 132] ¶ 42; [Dkt. No. 132-9] at 228-29; [Dkt. No. 138] at 11. When Brower was asked in his deposition whether Dosky expressed concerns about the draft GWA agreement, Brower responded "[n]ot really." [Dkt. No. 132-9] at 229; [Dkt. No. 138] at 11. On October 19, 2021, Ghadban emailed Brower and his counsel, Purnell, the final GWA purchase and sale agreement, explaining that she was comfortable signing the agreement for her property. [Dkt. No. 132] ¶ 43; [Dkt. No. 138] at 11.

Brower alleges that Ghadban put pressure on him to sign a contract with GWA. [Dkt. No. 134] ¶ 34; [Dkt. No. 134-15] at 215-19. Specifically, in his deposition, Brower testified that during a meeting at Ghadban's house on October 27, 2021, she "threatened" him that if he did not execute an agreement, he could be sued for not following through with the GWA Letter of Intent, his "land would be tied up," he "couldn't market it," and he "could lose guardianship of [his] mother's estate." [Dkt. No. 134-15] at 215-19. Ghadban denies making these statements to Brower. [Dkt. No. 142] at 12. There is no recording of this meeting which would enable the Court to determine exactly what happened. Brower also testified that when he called Purnell while he was at Ghadban's house and asked whether he could be sued for not signing an agreement with GWA, Purnell responded, "Maybe. Maybe not." [Dkt. No. 134-15] at 219-22; [Dkt. No. 132] ¶ 45; [Dkt. No. 138] at 11. Purnell did not say whether GWA would have a good

14

basis for suing Brower, and he did not tell Brower whether to sign the agreement.[16]  [Dkt. No. 134-15] at 221.

It is undisputed that on October 27, 2021, Brower signed two purchase and sale agreements with GWA for the Sellers' properties at a price of ███████ per acre (collectively, "Purchase and Sale Agreements").  [Dkt. No. 110] ¶¶ 16-17; [Dkt. No. 134] ¶¶ 20-21; [Dkt. No. 142] at 7-8.  The Sellers maintain that, before signing the agreements with GWA, Brower provided "all draft agreements, deeds, titles, and related land records" to Purnell and requested that he review them and provide advice about whether Brower should execute the agreements.  [Dkt. No. 123] ¶ 13.  The first agreement was signed on behalf of Pageland LLC and covered two parcels of property, comprising 115.789 acres, for a total sale price of ███████ ("Pageland Purchase and Sale Agreement").  [Dkt. No. 110] ¶ 16; [Dkt. No. 134] ¶ 20; [Dkt. No. 142] at 7-8.  The second agreement was signed on behalf of Barbara Brower and covered the third parcel of property, comprising 16 acres, for a total sale price of ███████ ("Barbara

---

[16] The Sellers maintain that Purnell did not fully advise Brower about his options regarding the threats that Ghadban allegedly made about the consequences of not signing a contract with GWA, because Purnell represented other assemblage sellers and therefore "would not give Brower full, unbiased advice because of his conflicts of interest."  [Dkt. No. 138] at 11.

In fact, on September 3, 2021, Brower shared a letter of intent from Kuhn with Purnell, who responded that the GWA and Kuhn offers were "almost identical" and expressed that he was "not sure" why Ghadban chose the GWA offer over the Kuhn offer and "even failed to present the other to the client base."  [Dkt. No. 134-17] at 2.  Nonetheless, Purnell advised Brower that the GWA Letter of Intent's 60-day exclusivity provision would make it "difficult to move on the new offer" and that Brower would only have a "right akin to malpractice rather than a breach of [fiduciary] duty" against Ghadban.  Id.  Brower asked about the "repercussions" of not signing a contract with GWA, pointing out that with the donation to the "foundation for county (buying off county)," the price he would receive was ███████ per acre, which was "below [his] agreement" with Ghadban.  Id.  On September 7, 2021, Purnell responded, "I think I am finding I have a conflict in all of this," explaining that he was also representing other assemblage sellers who "as a group are loyal to Mary Ann and thus I create a conflict between my various clients[.]"  Id. at 1.  Although Purnell recommended another attorney to Brower, id., there is no evidence in the record that Brower retained another attorney.

Brower Purchase and Sale Agreement"). [Dkt. No. 110] ¶ 17; [Dkt. No. 134] ¶ 21; [Dkt. No. 142] at 8. Under both agreements, the Sellers agreed "to donate to the Pageland Philanthropic Foundation, at Closing, ██████████████████████ per acre of Land."[17] [Dkt. No. 128-2] ¶ 25; [Dkt. No. 128-3] ¶ 25.

At some point after GWA and Brower executed the Purchase and Sale Agreements, Ghadban began representing a GWA affiliate in its efforts to purchase other parcels of land for the PWC Digital Gateway Project, serving as its broker for at least three land transactions in exchange for a commission of up to 3%. [Dkt. No. 134] ¶¶ 27-28; [Dkt. No. 142] at 10-11; [Dkt. No. 134-11]; [Dkt. No. 134-12] at 190-95. In her deposition, Ghadban testified that these land transactions involved parcels of land that are "not part of our 800 acres assemblage." [Dkt. No. 134-12] at 190-91. She did not disclose her representation of GWA and its affiliate to Brower, who claims he only learned of that relationship later in May 2022. [Dkt. No. 134] ¶ 30; [Dkt. No. 142] at 11.

   2.  <u>The Sellers and Buyer's Dispute</u>

On or about December 2, 2021, after executing the Purchase and Sale Agreements with the Sellers, GWA informed Brower and Purnell that it had learned from a title company that the 16-acre parcel listed in the Barbara Brower Purchase and Sale Agreement was not in fact owned by Barbara Brower but had been transferred to Pageland LLC in August 2000. [Dkt. No. 110] ¶ 18. As a result, GWA contacted Purnell to finalize an amendment to the Pageland Purchase and

---

[17] The Pageland Philanthropic Foundation was formed on April 18, 2022, as the Farmers' PW Digital Gateway Foundation ("Digital Gateway Foundation"). [Dkt. No. 134] ¶¶ 22, 35-36; [Dkt. No. 142] at 8, 12-13. Purnell served as the incorporator of the Digital Gateway Foundation, which was established for the purpose of "solicit[ing] and maintain[ing] a fund in perpetuity to help, improve and create opportunities for residents of Prince William County, Virginia." [Dkt. No. 134] ¶¶ 22-23; [Dkt. No. 134-9]; [Dkt. No. 142] at 8-9.

Sale Agreement to add that parcel to the agreement and terminate the Barbara Brower Purchase and Sale Agreement. Id. ¶ 19.

On January 17, 2022, GWA's outside counsel provided Brower and Purnell with a draft Amendment of the Pageland Purchase Agreement and Termination of the Barbara Brower Purchase Agreement ("Amendment and Termination Agreement"). [Dkt. No. 110] ¶ 20.   On February 15, 2022, Purnell, on behalf of Brower, communicated that the draft Amendment and Termination Agreement contained a typographical error. Id. ¶ 21.   On February 21, 2022, GWA's counsel provided Purnell and Brower with a revised draft agreement that corrected the error and requested execution as soon as possible.[18] Id. ¶ 22.   Brower did not sign the Amendment and Termination Agreement until after GWA initiated this civil action. Id. ¶ 23.

Section 7.1 of the Purchase and Sale Agreements provided that the Sellers agreed to "actively and fully support and cooperate with [GWA], using best and good faith efforts, in pursuing and obtaining [Price William County's] approval of the Plan Amendment, including promptly signing such documents as may be required in connection with obtaining such Plan Amendment." [Dkt. No. 110] ¶ 24.   Section 7.2.1 of the Purchase and Sale Agreements required GWA to "file its application for Data Center Rezoning not later than February 28, 2022." [Dkt. No. 110] ¶ 25.   In addition, Section 7.2.2 of the Purchase and Sale Agreements required that the Sellers work with GWA on executing any proffers with Prince William County, specifically:

> In the event the authorities of Prince William County require Purchaser or Seller, in order to obtain approval of the Data Center Rezoning, to agree to certain proffered conditions that may affect the Land, or if Purchaser desires to submit any proffers in connection with obtaining the Data Center Rezoning that may affect the Land

---

[18] The Buyer contends that GWA employees and outside counsel "spent time and effort" working with Purnell to ensure that the Amendment and Termination Agreement was acceptable to all parties. [Dkt. No. 128] ¶ 15.   The Sellers dispute that there is any evidence of "significant time or effort" expended by GWA, pointing out that GWA has produced and referred to only four emails that it sent concerning the title issue. [Dkt. No. 139] at 3.

("Proffers") . . . . All Proffer(s) shall be subject to the prior written approval of Seller, which approval shall not be unreasonably withheld, conditioned or delayed. Seller agrees to promptly execute the Proffers when requested by Purchaser . . . .

[Dkt. No. 110] ¶ 26.

On February 18, 2022, Ghadban sent Brower and Purnell a draft of a Master Amendment of the Purchase and Sale Agreements ("Master Amendment"), which, among other revisions, sought to extend GWA's Data Center Rezoning application filing deadline under Section 7.2.1 from February 28, 2022, to April 15, 2022.  [Dkt. No. 128] ¶ 20; [Dkt. No. 123] ¶ 19; [Dkt. No. 123-2].  Ghadban requested that the Master Amendment be executed by February 22, 2022.  [Dkt. No. 123] ¶ 19; [Dkt. No. 136] at 7.  Brower did not sign the Master Amendment, leaving GWA's deadline to file its application for Data Center Rezoning unchanged.  [Dkt. No. 128] ¶ 21; [Dkt. No. 139] at 4.

The next day, on February 19, 2022, Ghadban emailed Rezoning Forms to Brower, which he had to sign to enable GWA to file its application for Data Center Rezoning, and she asked that Brower return the forms by February 22, 2022.  [Dkt. No. 110] ¶ 27; [Dkt. No. 128] ¶ 23; [Dkt. No. 139] at 3.  Brower did not sign the Rezoning Forms.  [Dkt. No. 110] ¶ 28.

On February 21, 2022, Brower forwarded Ghadban's February 18, 2022 email to Edward Zughaib ("Zughaib"), a real estate attorney, and asked: "Not sure I should sign these would it put me further in the hole, what do u [sic] think about parcels B getting together collectively and renegotiate [sic] existing contract ?"[19]  [Dkt. No. 123-10] at 2; [Dkt. No. 123] ¶ 21; [Dkt. No. 136] at 7.  Although Brower contends that he was seeking legal advice from Zughaib, [Dkt. No.

---

[19] The Sellers contend that Brower sought legal advice from Zughaib about both the Master Amendment and the Amendment and Termination Agreement, [Dkt. No. 123] ¶ 21, which the Buyer disputes, pointing out that Brower forwarded Ghadban's February 18, 2022 email to Zughaib and only the Master Amendment was attached to her email, [Dkt. No. 136] at 7.

123] ¶ 21, Zughaib responded to Brower with the disclaimer, "I have not been retained by you and am not able to give you legal advice until you and I have entered into a formal attorney/client relationship," [Dkt. No. 123-10] at 1-2. Nevertheless, Zughaib advised Brower that "a plain reading of the Purchase and Sale Agreement (PSA) shows there is no language in the PSA that requires you to sign an amendment or puts you in default if you don't." Id. Relying on this statement from Zughaib, the Sellers maintain that Brower decided not to sign the draft Amendment and Termination Agreement, the Master Amendment, or the Rezoning Forms based on the advice of counsel.[20] [Dkt. No. 123] ¶ 24. The Buyer disputes the existence of an attorney-client relationship between Zughaib and Brower. [Dkt. No. 136] at 7-8.

On February 27, 2022, GWA's counsel, both by FedEx overnight delivery and email, sent Brower and Purnell a letter requesting that the Sellers execute the Rezoning Forms to ensure that GWA would be able to file its application for Data Center Rezoning on or before February 28, 2022. [Dkt. No. 110] ¶ 29. That correspondence advised the Sellers that if they failed to execute the Rezoning Forms by 1:00 pm Eastern Time on February 28, 2022, GWA would consider such failure a material default pursuant to Section 17.2 of the Purchase and Sale Agreements.[21] Id. ¶ 30. Brower did not sign the Rezoning Forms. Id. ¶ 31.

---

[20] The Sellers argue that Brower did not understand that there was a material difference between the Master Amendment and the Amendment and Termination Agreement. [Dkt. No. 123] ¶ 25. The Buyer disputes this assertion, pointing to evidence in the record that Brower was party to communications between GWA's counsel and Purnell regarding the title issue with the Barbara Brower Purchase and Sale Agreement and was aware that the Amendment and Termination Agreement would address this issue. [Dkt. No. 136] at 8. The Buyer also argues that Brower's suggestion to Zughaib to use GWA's request to execute the Master Amendment as a way to renegotiate the existing contract for Phase 2 landowners indicates that he understood that the Master Amendment and the Amendment and Termination Agreement were different agreements, as only the Master Amendment applied to all landowners, while the Amendment and Termination Agreement applied only to Brower. Id. at 8-9.

[21] Section 17.2 provides the remedies to which GWA is entitled "[i]n the event of any material breach, failure or default by Seller[.]" [Dkt. No. 128-2] § 17.2; [Dkt. No. 128-3] § 17.2.

Nonetheless, on February 28, 2022, GWA filed its initial rezoning application with the Prince William County Planning Office for the assemblage of properties comprising the Digital Gateway North and the Digital Gateway South. Id. ¶ 32. On March 2, 2022, the County notified GWA's counsel that its Data Center Rezoning application was missing a signed application from Barbara Brower and requested that GWA "forward that as soon as you get a chance please." [Dkt. No. 128-12]; [Dkt. No. 128] ¶ 28; [Dkt. No. 139] at 5.

In response to that notification, on March 7, 2022, GWA's counsel sent Brower and Purnell a letter, by email and FedEx overnight delivery, advising them that if Brower failed to execute the Rezoning Forms before 6:00 pm Eastern Time on that same day, GWA would file a lawsuit seeking compliance with the purchase and sale agreements. [Dkt. No. 110] ¶ 33. Brower did not execute the Rezoning Forms. Id. ¶ 34.

### B. Procedural History

On March 8, 2022, GWA filed an eight-count Complaint seeking: declaratory relief providing that Pageland LLC is required to execute the "Pageland Rezoning Form necessary for GWA to obtain approval of the Data Center Rezoning"[22] (Count I); declaratory relief against Barbara Brower for the same (Count II); specific performance against Pageland LLC "ordering Pageland to execute the Pageland Rezoning Form pursuant to the terms of the Pageland Purchase Agreement" (Count III); specific performance against Barbara Brower for the same (Count IV); breach of contract against Pageland LLC for refusing to execute the Pageland Rezoning Form (Count V); breach of contract against Barbara Brower for the same (Count VI); tortious

---

[22] The Complaint also phrases the request for declaratory relief as a declaration that "Pageland is required to execute the Rezoning Applications necessary for GWA to obtain approval of the Data Center Rezoning." [Dkt. No. 3] ¶ 41. The Complaint does not define "Rezoning Applications," and it is therefore unclear whether "Rezoning Applications" refers to the Rezoning Forms only or to GWA's Data Center Rezoning Application.

interference with contract against Brower (Count VII); and breach of the duty of good faith and

fair dealing against Barbara Brower (Brower as attorney-in-fact) for representing that she owned

the property in the Barbara Brower Purchase and Sale Agreement and declining to take steps to

address the title issue (Count VIII). [Dkt. No. 3]; [Dkt. No. 74]. GWA also filed a Motion for a

Temporary Restraining Order ("TRO Motion") requesting that the Court order the Sellers to

comply with the Purchase and Sale Agreements and complete and sign the rezoning documents.

[Dkt. No. 4]; [Dkt. No. 70].

On March 18, 2022, the Court held a hearing on GWA's TRO Motion, at which the

Sellers did not appear. On March 23, 2022, the Court granted the TRO Motion and ordered the

Sellers to "comply with all terms in the Purchase and Sale Agreements, including signing all

required rezoning forms within two (2) business days following the service of this Temporary

Restraining Order." [Dkt. Nos. 22, 24]. As a result, on March 28, 2022, Brower executed the

Rezoning Forms and the Amendment and Termination Agreement, which amended the Pageland

Purchase and Sale Agreement to cover the sale of all three parcels of the Brower property and

terminated the Barbara Brower Purchase and Sale Agreement. [Dkt. No. 110] ¶ 39.

On May 6, 2022, the Sellers filed one pleading containing their Answer to the Complaint,

a five-count Counterclaim against GWA, and a six-count Third-Party Complaint against

MagLandBroker and Ghadban. [Dkt. No. 36]; [Dkt. No. 111]. In that one pleading, the Sellers

improperly grouped their counterclaims and third-party claims, merging some of them under the

same counts. On July 12, 2022, the Court dismissed all five counterclaims against GWA and the

third-party claim in Count IV (conspiracy) against the Broker, [Dkt. No. 87], leaving only five

third-party claims against the Broker. As a result, the remaining counts of the Third-Party

Complaint are: fraud in the inducement (Count I); fraud (Count II); breaches of fiduciary duty

(Count III); breach of contract (Count V); and a request for declaratory relief providing that the Purchase and Sale Agreements are "voidable due to illegality, fraud, and/or duress" (Count VIII). [Dkt. No. 36].

On September 19, 2022, with leave of court, GWA filed the First Amended Complaint, which dropped the tortious interference with contract claim (Count VII) against Brower, who is no longer a direct defendant in this civil action. [Dkt. No. 100]. The parties have filed cross-motions for summary judgment, see [Dkt. Nos. 122, 127, 130, and 133], which have been fully briefed, and oral argument has been held.

On September 14, 2022, the Prince William County Planning Commission voted to recommend approval of the CPA which would allow for rezoning the area for development of a data center corridor. [Dkt. No. 123] ¶ 37; [Dkt. No. 136] at 10. On November 2, 2022, the Prince William County Board of County Supervisors voted to approve the CPA, but GWA's application for Data Center Rezoning has not yet been approved. [Dkt. No. 148] at 2 n.2. During the November 9, 2022 hearing on the parties cross-motions for summary judgment, plaintiff's counsel represented that GWA's rezoning application is pending before the Prince William County Board of County Supervisors and that the Sellers' continued cooperation will be requested. In addition, Brower testified in his deposition that he will execute the forms and agreements required by Prince William County, such as proffers, in connection with the CPA and the rezoning applications. [Dkt. No. 110] ¶ 47.

## II. DISCUSSION

Because the motions before the Court involve essentially two disputes, the Buyer's Motion and the Sellers' First Motion (which concern the First Amended Complaint) will be

addressed first, followed by the Broker's Motion and the Sellers' Second Motion (which concern the Third-Party Complaint).

### A. **Standard of Review**

#### 1. Motion to Dismiss

Rule 12(b)(1) requires that a civil action be dismissed when the court lacks subject matter jurisdiction over the dispute. The plaintiff bears the burden of proving that subject matter jurisdiction exists. Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982). When a defendant challenges subject matter jurisdiction on the grounds that "the complaint fails to allege sufficient facts to support subject matter jurisdiction," a court "assume[s] the truthfulness of the facts alleged." Kerns v. United States, 585 F.3d 187, 193 (4th Cir. 2009). When a defendant "challenges the veracity of the facts underpinning subject matter jurisdiction," a court may consider evidence outside the complaint to determine whether there are facts that support jurisdiction "without converting the motion to a summary judgment proceeding." Id. at 192.

Rule 12(b)(6) requires that a complaint be dismissed when it does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). To survive a motion to dismiss, a complaint must allege enough facts "to raise a right to relief above the speculative level." King v. Rubenstein, 825 F.3d 206, 214 (4th Cir. 2016) (quoting Twombly, 550 U.S. at 555). "Bare legal conclusions 'are not entitled to the assumption of truth' and are insufficient to state a claim." Id. (quoting Iqbal, 556 U.S. at 679).

#### 2. Motion for Summary Judgment

Under Fed. R. Civ. P. 56(a), summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." Norfolk S. Ry. Co. v. City of Alexandria, 608 F.3d 150, 156 (4th Cir. 2010) (quoting Fed. R.

Civ. P. 56(c)). The movant is entitled to judgment as a matter of law if the movant demonstrates

that the "nonmoving party has failed to make a sufficient showing on an essential element of her

case with respect to which she has the burden of proof," Celotex Corp. v. Catrett, 477 U.S. 317,

323 (1986), and the nonmovant fails to "come forward with specific facts showing that there is a

genuine issue for trial," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87

(1986) (internal quotations omitted).

     A genuine dispute about a material fact exists if "after reviewing the record as a whole, a

court finds that a reasonable jury could return a verdict for the nonmoving party." Dulaney v.

Packaging Corp. of Am., 673 F.3d 323, 330 (4th Cir. 2012). In making this inquiry, all

inferences must be drawn in favor of the nonmoving party. Smith v. Gilchrist, 749 F.3d 302, 307

(4th Cir. 2014). A party cannot defeat a motion for summary judgment by offering unsupported

opinions, conclusions, or "mere allegations." Glynn v. EDO Corp., 710 F.3d 209, 213 (4th Cir.

2013) (quoting Bouchat v. Balt. Ravens Football Club, Inc., 346 F.3d 514, 522 (4th Cir. 2003)).

Rather, a party must "cit[e] to particular parts of materials in the record, including depositions,

documents, electronically stored information, affidavits or declarations, stipulations . . . ,

admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). "If the

adverse party fails to provide evidence establishing that the factfinder could reasonably decide in

his favor, then summary judgment shall be entered 'regardless of any proof or evidentiary

requirements imposed by the substantive law.'" Dash v. Mayweather, 731 F.3d 303, 311 (4th

Cir. 2013) (quoting Bouchat, 346 F.3d at 522).

     Where there are cross-motions for summary judgment, a court "consider[s] and rule[s]

upon each party's motion separately to determine whether summary judgment is appropriate as

to each." Monumental Paving & Excavating, Inc. v. Penn. Mfrs. Ass'n Ins. Co., 176 F.3d 794, 797 (4th Cir. 1999).

### B.   The Buyer's First Amended Complaint

The Sellers have filed a motion to dismiss or, in the alternative, for summary judgment as to the First Amended Complaint, and the Buyer has filed a cross-motion for summary judgment. [Dkt. Nos. 122, 127]. For the reasons that follow, the Sellers' First Motion will be granted as to Counts II, III, IV, VI, and VII of the First Amended Complaint and denied as to Counts I and V, and the Buyer's Motion will be granted as to Counts I and V and denied as to all other counts.

### 1.   Claims Against Barbara Brower (Counts II, IV, VI, and VII)

Counts II, IV, VI, and VII of the First Amended Complaint, respectively involving claims for declaratory relief, specific performance, breach of contract, and breach of the duty of good faith and fair dealing, name only Barbara Brower as a defendant.

It is uncontested that Barbara Brower is ninety-years-old and has dementia.[23] All of the parties have stipulated that throughout all relevant time periods, Brower served as attorney-in-fact for his mother, Barbara Brower, with the authority to manage and dispose of all her affairs and property, [Dkt. No. 110] ¶ 3, pursuant to a durable general power of attorney executed on August 27, 2018. That general power of attorney takes effect when Barbara Brower is "no longer capable of managing [her] own affairs as determined by an attending physician . . . that [she is] incapable of the care, custody and management of [her] property because of advanced age, illness or impaired health or mental disability, or upon the order of a court of competent jurisdiction declaring [her] mental incapacity." [Dkt. No. 105-1]. Although Brower acted on

---

[23] The Buyer neither admits nor disputes the Sellers' assertion that Barbara Brower has dementia but responds that it is "[i]rrelevant and immaterial to both GWA's claims against [d]efendants and the arguments contained in [d]efendants' [m]otion." [Dkt. No. 136] at 5.

Barbara Brower's behalf as her attorney-in-fact in signing and executing the Barbara Brower Purchase and Sale Agreement, these four counts name only Barbara Brower as a defendant, not Brower. Because the uncontested evidence in this record shows that Barbara Brower lacks mental capacity, and that Brower undertook all of the conduct underlying the Buyer's claims against his mother, Barbara Brower is not a proper defendant for these claims.

Moreover, because Barbara Brower is no longer a party to any transaction with GWA, Counts II and IV, which seek declaratory relief and specific performance relating to enforcement of the terminated Barbara Brower Purchase and Sale Agreement, are moot. It is uncontested that Brower executed the Amendment and Termination Agreement, which terminated the Barbara Brower Purchase and Sale Agreement and amended the Pageland Purchase and Sale Agreement to cover all three parcels of the Brower property, on March 28, 2022. See [Dkt. No. 110] ¶ 39; [Dkt. No. 128-15] ¶¶ 2-3. Therefore, the undisputed record reflects that the Buyer has no enforceable contract with Barbara Brower, and she has no further obligations with respect to GWA's Data Center Rezoning application or the PWC Digital Gateway Project. Accordingly, the Sellers' First Motion will be granted as to Counts II and IV, the Buyer's Motion will be denied as to these counts, and the counts will be dismissed as moot.

Although Count VI asserts a breach of contract claim against Barbara Brower based on Brower's refusal to sign the Rezoning Forms, the relief sought—nominal damages and reasonable attorney's fees—overlaps with the claim and relief sought in Count V for breach of contract against Pageland LLC. Both counts are based on the same underlying conduct by Brower, i.e., his refusal to sign the Rezoning Forms. Therefore, the Sellers' First Motion will be granted as to Count VI, which will be dismissed on the grounds that it provides for no additional relief, and the Buyer's Motion will be denied as to this count.

Finally, Count VII alleges that Barbara Brower, with Brower as attorney-in-fact, breached the duty of good faith and fair dealing implied in the Barbara Brower Purchase and Sale Agreement, because (1) she represented that she owned and could sell the 16-acre property identified in the agreement, when in fact it had been transferred to Pageland LLC in 2000, (2) she failed to disclose that the property had been transferred to Pageland LLC, and (3) upon being advised of the title issue, she failed to take steps to correct the agreement.

"[I]n Virginia, every contract contains an implied covenant of good faith and fair dealing," including common law contracts such as those for the purchase and sale of real property. Wolf v. Fed. Nat'l Mortg. Ass'n, 512 F. App'x 336, 345 (4th Cir. 2013) (quoting Enomoto v. Space Adventures, Ltd., 624. F. Supp. 2d 443, 450 (E.D. Va. 2009)); see Stoney Glen, LLC v. Southern Bank and Trust Co., 944 F. Supp. 2d 460, 465 (E.D. Va. 2013). The elements of a claim for breach of the implied covenant of good faith and fair dealing are "(1) a contractual relationship between the parties, and (2) a breach of the implied covenant." Elegant Massage, LLC v. State Farm Mutual Auto. Ins. Co., 506 F. Supp. 3d 360, 381 (E.D. Va. 2020) (quoting Enomoto, 624 F. Supp. 2d at 450). The duty of good faith and fair dealing "prohibits a party from acting arbitrarily, unreasonably, and in bad faith." Id.

The Sellers erroneously argue that Virginia law does not recognize an implied covenant of good faith and fair dealing for contracts not governed by the Uniform Commercial Code ("UCC"). For that proposition, the Sellers cite cases from this district that rely on Harrison v. U.S. Bank National Association, No. 3:12-cv-224, 2012 WL 2366163, at *2 (E.D. Va. June 20, 2012), but Harrison is an outlier and improperly read the Virginia Supreme Court's decision in Greenwood Associates, Inc. v. Crestar Bank, 448 S.E.2d 399 (Va. 1994), which concerned the statutory duty of good faith and fair dealing in Virginia's UCC. See Stoney Glen, 944 F. Supp.

2d at 465 n.7. The great weight of authority supports the existence of an implied duty of good faith and fair dealing in common law contracts in Virginia; however, as the Sellers correctly point out, Virginia does not recognize a standalone claim for breach of the implied duty of good faith and fair dealing.

Rather, a claim for breach of the implied duty of good faith and fair dealing must be brought as part of a claim for breach of contract, not as an independent tort claim. Stoney Glen, 944 F. Supp. 2d at 465; see Drummond Coal Sales, Inc. v. Norfolk S. Ry. Co., 3 F.4th 605, 611 (4th Cir. 2021); Phillips v. Wells Fargo Bank, N.A., No. 3:17-cv-519-JAG, 2018 WL 659199, at *3 (E.D. Va. Feb. 1, 2018). To the extent Count VII is asserted as an independent claim, it will be dismissed, and to the extent the claim is raised against Barbara Brower as part of a breach of contract claim, it will be dismissed because GWA has offered only conclusory allegations that Brower, as attorney-in-fact for Barbara Brower, acted dishonestly or in bad faith in representing that Barbara Brower owned the 16-acre property and by failing to correct the issue to "try to extort more money from GWA[.]" [Dkt. No. 128] at 20. Accordingly, the Buyer's Motion will be denied as to Count VII, and the Sellers' First Motion will be granted as to that count.

For these reasons, the Sellers' First Motion will be granted as to Counts II, IV, VI, and VII of the First Amended Complaint, the Buyer's Motion will be denied as to those counts, and Counts II, IV, VI, and VII will be dismissed.

### 2. Specific Performance Against Pageland LLC (Count III)

The Sellers argue that Count III, which seeks specific performance against Pageland LLC, must be dismissed as moot, because Brower has signed the Rezoning Form—satisfying the relief requested in the First Amended Complaint—and will not be required to sign the form again. The Buyer argues that its claim is not moot because the Data Center Rezoning application is pending, and GWA seeks a permanent injunction requiring the Sellers to refrain from violating

28

the terms of the Pageland Purchase and Sale Agreement, including its confidentiality provision, encouraging third parties to breach their agreements, and disparaging GWA, the CPA, the rezoning application, or the development plan, and to "[d]iligently pursue," within three business days, the CPA, including signing forms and approving documents.  See [Dkt. No. 127-2].

Federal courts lack subject matter jurisdiction over cases that are moot, and "[a] case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III— when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." Long v. Pekoske, 38 F.4th 417, 422-23 (4th Cir. 2022) (quoting Already, LLC v. Nike, Inc., 568 U.S. 85, 91 (2013)).  A civil action can become moot due to a change in factual circumstances, such as "when the claimant receives the relief he or she sought to obtain through the claim." Simmons v. United Mortg. & Loan Inv., LLC, 634 F.3d 754, 763 (4th Cir. 2011) (quoting Friedman's, Inc. v. Dunlap, 290 F.3d 191, 197 (4th Cir. 2002)).  Because the requirement of mootness "appl[ies] independently to each form of relief sought," each claim must be evaluated separately.  Carter v. Fleming, 879 F.3d 132, 137 (4th Cir. 2018).

It is uncontested that, as pleaded in the First Amended Complaint, Count III only requests "an order for specific performance . . . ordering Pageland to execute the Pageland Rezoning Form pursuant to the terms of the Pageland Purchase Agreement."  [Dkt. No. 100] at 14. Because Brower signed the Rezoning Form on behalf of Pageland LLC on March 28, 2022, in response to the Court's TRO, plaintiff has received all the relief sought in Count III, and the Court therefore does not have "effective relief to offer" as to Count III.  Williams v. Ozmint, 716 F.3d 801, 809 (4th Cir. 2013) (quoting Friedman's, Inc., 290 F.3d at 197) (holding that a claim for injunctive relief was moot where the plaintiff had "received the restoration of his visitation privileges that he requested in his complaint").  To the extent the Buyer is seeking injunctive

relief that is broader than what was sought in the First Amended Complaint, it may not amend its claims through a summary judgment motion.

For these reasons, the Sellers' First Motion will be granted as to Count III of the First Amended Complaint, the Buyer's Motion will be denied as to this count, and Count III will be dismissed.

### 3. Declaratory Judgment Against Pageland LLC (Count I)

For a similar reason, the Sellers argue that the Buyer's claim for declaratory judgment against Pageland LLC is also moot; however, the declaratory relief sought against Pageland LLC in Count I encompasses broader relief than the specific performance claim in Count III, as it can be construed as seeking a declaration requiring Brower's continued compliance with the process for obtaining approval of GWA's Data Center Rezoning application.  See supra n.22.

The Buyer contends that it continues to have a live dispute with the Sellers because it anticipates needing Brower's cooperation as the County considers the Data Center Rezoning application.  For example, the County may request voluntary proffers to ensure there is proper infrastructure for data centers, such as additional sewers and expanded roadways.  Brower's history of failing to comply with the Purchase and Sale Agreements and to sign other relevant documents provides a reasonable basis for the Buyer to be concerned about the Sellers' future cooperation.  The Sellers argue that whether or not the County will seek voluntary proffers from landowners is speculative.

Although there is some uncertainty as to whether the County will ultimately request voluntary proffers, the Court is persuaded, because the Data Center Rezoning application is still pending, that there is a reasonable possibility that GWA will continue to need and require Brower's cooperation during the rezoning process and that his past refusals to cooperate with that process and obvious dissatisfaction with the GWA agreement are sufficient to support the

30

conclusion that the Buyer's declaratory relief claim is not moot. Further, the Pageland Purchase and Sale Agreement requires that the Sellers work with the Buyer on executing proffers, obligating the Sellers not to "unreasonably withh[o]ld, condition[] or delay[]" approval of the proffers and to "promptly execute the [p]roffers when requested by Purchaser." [Dkt. No. 110] ¶ 26. Therefore, this is not a case involving a "defunct controversy," but rather one that involves a "definite and concrete controversy touching the ongoing legal relations" between the Buyer, as a purchaser and developer involved in the PWC Digital Gateway Project, and the Sellers, as the owner of three parcels of land at issue. Genesis Healthcare, Inc. v. Becerra, 39 F.4th 253, 261 (4th Cir. 2022).

In arguing that the declaratory judgment claim is moot, the Sellers point out that on September 13, 2022, Brower testified in his deposition that going forward he will cooperate with GWA in obtaining rezoning for the PWC Digital Gateway Project, including signing forms and agreements required by the County. See [Dkt. No. 123-15] at 20; [Dkt. No. 110] ¶ 47. As the Buyer correctly points out, Brower's argument is unpersuasive under the voluntary cessation doctrine, which provides that a defendant's "'voluntary cessation of a challenged practice' generally [will not] moot a plaintiff's claims." Long, 38 F.4th at 423 (quoting Friends of the Earth, Inc., v. Laidlaw Env't Servs. (TOC), Inc., 528 U.S. 167, 189 (2000)). A "defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." Id. (quoting Friends of the Earth, Inc., 528 U.S. at 189).

Brower does not meet his burden of showing that his voluntary cessation moots the Buyer's claim based on his deposition testimony that he will cooperate with the rezoning process. To determine whether voluntary cessation moots a claim, courts "often look for a

31

change in official policy or law, or some other external constraint on the defendant's action," and "[i]n the absence of such a constraint, 'when a defendant retains the authority and capacity to repeat an alleged harm, a plaintiff's claim should not be dismissed as moot.'" Davidson v. Plowman, 191 F. Supp. 3d 553, 557 (E.D. Va. 2016) (quoting Wall v. Wade, 741 F.3d 492, 497 (4th Cir. 2014)). Here, Brower's statement is merely a "bald assertion . . . that [he] will not resume a challenged [action]," id. (quoting Wall, 741 F.3d at 498), and there is no external constraint preventing him from again refusing to cooperate in the future.

Given that Count I is not moot, the Court turns to the merits of the claim. A court retains discretion to award declaratory relief, and a declaratory judgment is "appropriate 'when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and . . . when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.'" Centennial Life Ins. Co. v. Poston, 88 F.3d 255, 256 (4th Cir. 1996) (quoting Aetna Cas. & Sur. Co. v. Quarles, 92 F.2d 321, 325 (4th Cir. 1937)). A declaratory judgment is not appropriate solely to remedy past misconduct, but rather is "only appropriate when it would 'serve a useful purpose in clarifying and settling the legal relations in issue' to guide the parties for the future." Beazer Homes Corp. v. VMIF/Anden Southbridge Venture, 235 F. Supp. 2d 485, 494 (E.D. Va. 2002) (quoting Dunn Computer Corp. v. Loudcloud, Inc., 133 F. Supp. 2d 823, 829 (E.D. Va. 2001)).

A judgment declaring that the Sellers are required to execute the Rezoning Applications is justified in this case. Based on Brower's prior refusal to comply with GWA's requests to execute the Rezoning Forms and the Amendment and Termination Agreement until the Court issued a temporary restraining order, as well as clear evidence of his dissatisfaction with the deal he struck with GWA, the Buyer's concerns about Brower's future noncompliance are reasonable.

32

The requested declaratory relief does not seek to remedy only past misconduct regarding the Rezoning Forms but rather addresses GWA's concerns regarding Brower's cooperation with site-specific rezoning approvals and voluntary proffers, for which the Pageland Purchase and Sale Agreement requires the Sellers' approval and prompt execution. Therefore, a declaratory judgment requiring that the Sellers cooperate with the Buyer on executing the Data Center Rezoning application would settle the legal relations between them, clarify the Sellers' obligations under the Pageland Purchase and Sale Agreement, terminate the Buyer's insecurity giving rise to this civil action, and thereby avoid a risk of future litigation. See Quarles, 92 F.2d at 325.

Accordingly, the Sellers' First Motion will be denied as to Count I of the First Amended Complaint, and the Buyer's Motion will be granted as to this count.

4. Breach of Contract Against Pageland LLC (Count V)

The Sellers have stipulated that they did not sign the Rezoning Forms as requested but nonetheless argue that Count V for breach of contract against Pageland LLC based on Brower's failure to sign the forms must be dismissed because of an absence of damages. The Buyer maintains that it is entitled to summary judgment on the breach of contract claim and seeks nominal damages and an award of attorney's fees and costs.

In Virginia, the elements of a breach of contract claim are: "(1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." Filak v. George, 594 S.E.2d 610, 619 (Va. 2004). "In a breach-of-contract action, summary judgment is appropriate where the language of the contract is unambiguous or 'where an ambiguity can be definitely resolved by reference to extrinsic evidence.'" CMA CGM S.A. v. Leader Int'l Express

33

Corp., 474 F. Supp. 3d 807, 814 (E.D. Va. 2020) (quoting Wash. Metro. Area Transit Auth. v.

Potomac Inv. Props., Inc., 476 F.3d 231, 235 (4th Cir. 2007)).

 The Buyer and Sellers do not dispute the existence of a binding contract between them

and have stipulated that Brower breached that contract by failing to sign the Rezoning Form on

behalf of Pageland LLC despite GWA's multiple requests.  See [Dkt. No. 110] ¶¶ 28, 31, 34.

Nevertheless, the Sellers argue that the Buyer has neither alleged nor proven any damages from

the belated signing of the form, because Prince William County has not rejected GWA's Data

Center Rezoning application for lack of the Sellers' signature on the application.

 Under Virginia law, "[p]roof of damages is an essential element of a breach of contract

claim, and failure to prove that element warrants dismissal of the claim."  Western Insulation, LP

v. Moore, 316 F. App'x 291, 297 (4th Cir. 2009) (quoting Sunrise Continuing Care, LLC v.

Wright, 671 S.E.2d 132, 156 (Va. 2009)).  "The plaintiff also has the 'burden of proving with

reasonable certainty the amount of damages and the cause from which they resulted; speculation

and conjecture cannot form the basis of the recovery,'" id. (quoting Sunrise Continuing Care,

671 S.E.2d at 156); however, Virginia law also "provides for an award of nominal damages in

cases where the plaintiff proves that a breach of contract occurred"—including injury or damage

caused by the breach—but "does not prove compensatory damages," id. at 298.  See Crist v.

Metro. Mortg. Fund, Inc., 343 S.E.2d 308, 311 (Va. 1986) (affirming award of nominal damages

where actual damages are "contingent, speculative, and uncertain"); Kerns v. Wells Fargo Bank,

N.A., 818 S.E.2d 779, 785-86 (Va. 2018) ("Nominal damages are appropriate when there is a

legal right to be vindicated against an invasion that has produced no actual, present loss of any

kind or where, from the nature of the case, some injury has been done but the proof fails to show

the amount." (internal quotations omitted)).

34

Here, the Buyer only seeks nominal damages and has established that it suffered an actual injury from the Sellers' breach, which is sufficient to support an award of nominal damages. Based on the declaration of a GWA employee responsible for managing the PWC Digital Gateway Project, the Buyer has shown that it suffered damages in the form of (1) an increased risk that the Data Center Rezoning application would be rejected due to the missing signature, which could have jeopardized its purchase and sale agreements with other assemblage sellers, and (2) the time, effort, and resources involved in securing Brower's compliance with signing the Rezoning Form, including retaining outside counsel and having to file this lawsuit. [Dkt. No. 128-4] ¶¶ 8-10; [Dkt. No. 128] at 16-17.

The Sellers' attempts to avoid liability by arguing that the Buyer did not suffer damages are unpersuasive. First, the Sellers argue that GWA cannot claim to have suffered damages from Brower's failure to sign the Rezoning Form by its February 28, 2022 deadline, which was "arbitrary" and "self-imposed," when GWA was also seeking to extend its own deadline to file the Data Center Rezoning application to April 15, 2022 by having Brower execute a Master Amendment to the Purchase and Sale Agreements. [Dkt. No. 139] at 6. This argument is meritless. Because Brower did not execute the Master Amendment (and in fact the Master Amendment was later withdrawn as to all assemblage sellers), GWA's deadline to file the Data Center Rezoning application did not change and remained February 28, 2022.

The Sellers also contend that the increased risk that GWA's Data Center Rezoning application would be rejected is "pure, unfounded speculation." [Dkt. No. 139] at 10. The Sellers point out that the Prince William County Planning Commission approved the CPA on September 14, 2022, which shows that the Buyer's claim of "exponential risk" was "demonstrably false." Id. 10-11. The Buyer responds that it has never taken the position that

35

Brower's refusal to execute the Rezoning Form increased the risk that the entire CPA would be rejected, and instead claims that his failure to sign the form increased the risk that GWA's specific Data Center Rezoning application would be rejected. [Dkt. No. 148] at 10. As the Buyer correctly points out, the Sellers conflate approval of the CPA with approval of GWA's Data Center Rezoning application, which still remains pending before the County. Moreover, because the injury suffered from the increased risk that GWA's Data Center Rezoning application would be rejected is speculative and difficult to calculate, nominal damages are appropriate. In any case, the additional resources and effort that the Buyer expended as a result of Brower's failure to sign the Rezoning Form are more than sufficient to support an award of nominal damages.

Finally, the Sellers attempt to avoid liability for breach of contract by asserting two defenses, neither of which have any merit. First, the Sellers argue for the first time in their opposition to the Buyer's Motion for Summary Judgment that the Buyer is not entitled to any damages because it violated the Sellers' contractual right to cure the deficiencies pursuant to Section 17.6 of the Purchase and Sale Agreements, which provides that the defaulting party, after being issued a written notice of default, has ████ "in which to cure the default" before the non-defaulting party may exercise the remedies provided for in the agreement. [Dkt. No. 128-2] § 17.6. The Sellers contend that GWA, at best, provided Brower with only ten days in which to cure the default when it sent its February 27, 2022 notice.

Fed. R. Civ. P. 8(c) requires that a party raise any affirmative defenses in a responsive pleading, and "[i]t is settled that a failure to raise an affirmative defense in the appropriate pleading results in the loss of that defense . . . [;] [h]owever, even if a party fails to plead an affirmative defense, the opposing party still must show 'prejudice or unfair surprise' before the

waiver will be enforced." <u>RCSH Operations, L.L.C. v. Third Crystal Park Assocs. L.P.</u>, 115 F.

App'x 621, 629-30 (4th Cir. 2004) (quoting <u>Brinkley v. Harbour Recreation Club</u>, 180 F.3d 598,

612 (4th Cir. 1999)).

The Buyer correctly argues that the Sellers have waived this affirmative defense because

they did not assert it either in their Answer to the Complaint filed on May 6, 2022, [Dkt. No. 36],

or in their responsive pleading to the First Amended Complaint (<u>i.e.</u>, the Motion to Dismiss or, in

the Alternative, for Summary Judgment [Dkt. No. 123]), but rather raised it for the first time in

their opposition to the Buyer's Motion for Summary Judgment, [Dkt. No. 139] at 12-13.  Raising

this affirmative defense at a late hour in an opposition brief, months after discovery has

concluded, "results in unfair surprise and inadequate opportunity to prepare to rebut the

defense." <u>Williams v. Gradall Co.</u>, 990 F. Supp. 442, 446 (E.D. Va. 1998) (finding waiver of a

warranty disclaimer defense that was first raised in a motion for partial summary judgment).  The

Buyer would be prejudiced if the Sellers were permitted to assert this defense at this late stage of

the proceeding, and there is no reason why the Sellers could not have raised this affirmative

defense earlier in this litigation. <u>See</u> <u>Tidewater Finance Co., Inc. v. Fiserv Sols., Inc.</u>, 192 F.R.D.

516, 524 (E.D. Va. 2000) ("A finding of waiver is especially justified where the opposing party

would be unduly prejudiced by the failure to timely raise the defense.").[24]  For these reasons, this

argument is rejected.

Second, the Sellers assert the defense of reliance on advice of counsel, specifically that

Brower held a "reasonable belief based on the advice of an attorney" that the terms of the

---

[24] Even if the Court were to consider this affirmative defense, it would not help the Sellers.  As
the Buyer points out, it took Brower 36 days to cure the default by signing the Rezoning Form,
as GWA first asked Brower to sign the forms on February 19, 2022, and he only signed them on
March 28, 2022, after the Court issued the TRO.

Purchase and Sale Agreements did not require him to sign either the Master Amendment or the Rezoning Forms by a specific date. [Dkt. No. 123] at 23-25 & n.8. In support of this defense, Brower points to his email correspondence with Zughaib, in which Zughaib wrote that "a plain reading of the Purchase and Sale Agreement (PSA) shows there is no language in the PSA that requires you to sign an amendment or puts you in default if you don't," although Zughaib also stipulated that he was "not able to give [Brower] legal advice" because he had not been formally retained. [Dkt. No. 123-10]. In his declaration, Brower states that he "understood Mr. Zughaib's advice to mean that I also did not need to sign the rezoning forms when GWA requested that I do so because they were seeking an extension of the time to file the rezoning application to April 15, 2022," he "believed that the requirement to sign the rezoning forms fell under the terms of those amendments and not the purchase agreements," and based on Zughaib's "legal advice," he declined to sign the documents by February 28, 2022. [Dkt. No. 123-1] ¶¶ 12-13.

As an initial matter, the Sellers cite no cases supporting their argument that the advice of counsel is a valid defense to a breach of contract claim under Virginia law, and there does not appear to be authority to support that proposition. See United States v. Bissonnette, No. 1:16-cv-1070 (RDA/IDD), 2021 WL 1438309, at *5 (E.D. Va. Mar. 24, 2021) (declining to recognize advice of counsel as a meritorious defense to breach of contract and observing that the defendant "fail[ed] to marshal any authority . . . demonstrating that good-faith reliance is a valid defense to the causes of action [the] [p]laintiff brought in this case: breach of contractual and fiduciary duties," and "the cases [p]laintiff relies upon involved different causes of action, including some that required evidence of specific intent" which is not required to prove breach of contract). As in Bissonnette, the Sellers rely on cases not involving a breach of contract claim, such as In re Global Computer Enterprises, Inc., No. 14-13290-BFK, 2017 WL 3580171 (E.D. Va. Aug. 15,

2017), which discussed advice of counsel as a defense to civil False Claims Act violation, and United States v. Westbrooks, 780 F.3d 593 (4th Cir. 2015), which concerned criminal contempt.

Even if good faith reliance on advice of counsel were recognized as a valid defense to a breach of contract claim in Virginia, Brower would be required to establish that he made "(a) full disclosure of all pertinent facts to an attorney, and (b) good faith reliance on the attorney's advice." In re Global Computer Enterprises, Inc., 2017 WL 3580171, at *19; see United States v. Newport News Shipbuilding, Inc., 276 F. Supp. 2d 539, 565 (E.D. Va. 2003) (False Claims Act claim); United States v. Powell, 680 F.3d 350, 356 (4th Cir. 2012) (articulating same standard for "reliance on the legal advice of counsel," which a defendant "may use . . . 'to refute the government's proof that [he] intended to commit the offense,'" which was making, or aiding or abetting in making, a false entry in a bankruptcy-related document (quoting United States v. Miller, 658 F.2d 235, 237 (4th Cir. 1981))).

Here, the Sellers have failed to make a sufficient showing that Brower had an attorney-client relationship with Zughaib, that Brower disclosed all pertinent facts to Zughaib, and that Zughaib advised Brower not to sign the Rezoning Forms. The Buyer maintains that Brower forwarded only the proposed Master Amendment to Zughaib, and therefore his "advice" was limited to the Sellers' potential obligation to execute the Master Amendment. Brower's email correspondence with Zughaib shows that Brower did not forward the Rezoning Forms, and Zughaib's response discussing the "amendment" supports the conclusion that Zughaib's advice was limited to the Master Amendment, not the Rezoning Forms. [Dkt. No. 123-10]. The Sellers contend that Brower believed that Zughaib was providing legal advice on the Master Amendment, the Amendment and Termination Agreement, and the Rezoning Forms; however, based on Brower's assertion alone, the Sellers have not met their burden of establishing a factual

39

basis for the defense of advice of counsel, especially given Zughaib's clear statement that he was not giving legal advice.  Moreover, Zughaib did not advise Brower not to sign the amendment but merely told Brower that he was not required to sign based on a plain reading of the Purchase and Sale Agreements.  On this record, the Court declines to recognize this defense.

For these reasons, the Sellers' First Motion will be denied as to Count V of the First Amended Complaint for breach of contract, and the Buyer's Motion will be granted as to this count.  The Buyer will be awarded nominal damages of $10.00 and will be able to present its position as to the reasonable attorney's fees and costs it claims pursuant to the Pageland Purchase and Sale Agreement.[25]

In sum, the Sellers' First Motion will be granted as to the First Amended Complaint's claims for declaratory relief (Count II), breach of contract (Count VI), and breach of the duty of good faith and fair dealing (Count VII) against Barbara Brower and the claims for specific performance against Pageland LLC and Barbara Brower (Counts III and IV), which will be dismissed, and denied as to the claims for declaratory relief (Count I) and breach of contract (Count V) against Pageland LLC; and the Buyer's Motion will be granted as to the claims for declaratory relief (Count I) and breach of contract (Count V) against Pageland LLC, and denied as to all other counts.

---

[25] Specifically, the agreement provides that "[i]f any legal action . . . relating to this Agreement or the enforcement of any provision of this Agreement is brought against any party hereto, the prevailing party shall be entitled to recover reasonable attorneys' fees, costs, and disbursements, court costs and the cost of any expert witnesses . . . ."  [Dkt. No. 128-2] § 21.4.

### C. **The Seller's Third-Party Complaint**

The Sellers and Broker have filed cross-motions for summary judgment as to the Sellers'
Third-Party Complaint. [Dkt. Nos. 130, 133]. For the reasons that follow, the Broker's Motion
will be granted, and the Sellers' Second Motion will be denied.

#### 1. Fraudulent Inducement and Fraud (Counts I and II)

Counts I and II of the Third-Party Complaint allege that Ghadban fraudulently induced
Brower to enter into the Purchase and Sale Agreements with GWA; however, the Sellers do not
seek recission of the Purchase and Sale Agreements, because recission would materially affect
the other landowners in the assemblage. Rather, the Sellers seek $4,612,615 in damages, which
represents the difference between the per acre purchase prices offered by Kuhn and GWA, to
compensate them for the loss they allegedly suffered by Ghadban's fraudulent
misrepresentations. [Dkt. No. 134] at 26-27.

To prevail on a claim for fraud in the inducement, a plaintiff must prove "by clear and
convincing evidence [that]: (1) the defendant made a material misrepresentation for the purpose
of procuring a contract; (2) the plaintiff relied on the misrepresentation; and (3) the plaintiff was
induced by the misrepresentation to enter into the agreement." Fransmart, LLC v. Freshii Dev.,
LLC, 768 F. Supp. 2d 851, 864 (E.D. Va. 2011). "[C]oncealing or omitting a material fact can
also give rise to a claim of actual fraud." Murr v. Cap. One Bank (USA), N.A., 28 F. Supp. 3d
575, 584 (E.D. Va. 2014). "Although silence does not constitute fraud in the absence of a duty
to disclose, . . . 'concealment of a material fact by one who knows that the other party is acting
upon the assumption that the fact does not exist constitutes actionable fraud.'" Id. (quoting Allen
Realty Corp. v. Holbert, 318 S.E.2d 592, 597 (Va. 1984)). Fraud by concealment requires a
showing of "actual intent to conceal a fact," and "[r]eckless non-disclosure is not actionable."
Carlucci v. Han, 907 F. Supp. 709, 740 (E.D. Va. 2012).

Brower alleges three misrepresentations that purportedly induced him to enter into the Purchase and Sale Agreements with GWA. First, he asserts that Ghadban misrepresented the value of the Brower property, specifically that it was worth less than the Phase 1 properties. This theory fails because the Sellers have not pointed to any facts showing that Ghadban's statements constitute a "misrepresentation of a present and pre-existing fact at the time of the fraudulent conduct." Metro Mail Servs, Inc. v. Pitney Bowes, Inc., No. 1:16-cv-1416, 2017 WL 1230848, at *7 (E.D. Va. Mar. 31, 2017) (citing Abi-Najm v. Concord Condo., LLC, 699 S.E.2d 483, 490 (Va. 2010)). Although the Sellers dispute the validity of Ghadban's reasons for valuing the Phase 1 and Phase 2 properties differently, there are no facts before the Court upon which a reasonable factfinder could find that Ghadban's statements about the values of the properties were untrue or otherwise a misrepresentation. The Sellers have offered no evidence, such as an expert report evaluating the two phases, upon which to claim that Ghadban had no legitimate basis for valuing the phases differently.[26]

Second, Brower asserts that Ghadban failed to disclose to him the Updated Kuhn Letters of Intent, which offered a higher purchase price, and such failure amounts to a misrepresentation by concealment. Although a fraudulent inducement claim can be based on concealment of a material fact where there is a duty to disclose, the "concealment must have been intended to induce and must, in fact, have induced, the formation of the contract." Ware v. Scott, 257 S.E.2d 855, 857 (Va. 1979). Here, the concealment of the Updated Kuhn Letters of Intent cannot have

---

[26] The Sellers attempt to undermine Ghadban's stated reasons for the differential value by pointing out that the widening of Pageland Lane would affect the cost of development for both Phase 1 and Phase 2 and that she testified in her deposition that a substantial portion of the Phase 1 property will be used by GWA for open space and parks. [Dkt. No. 138] at 3-4. Although these assertions might weaken Ghadban's rationale for valuing Phase 1 and Phase 2 differently, they do not establish that her valuation was a misrepresentation of a present and pre-existing fact when she and Brower were negotiating the purchase and sale agreements in 2021.

induced Brower to enter into the GWA Purchase and Sale Agreements, because there was no
concealment when he signed those Agreements.  Specifically, even though Ghadban did not
initially disclose the Updated Kuhn Letters of Intent to Brower when she received them, the
undisputed record shows that the terms of those offers were disclosed to Brower by September 7,
2021, and that Brower also received the Final Kuhn Letter of Intent on September 18, 2021.  All
of these disclosures occurred over a month before Brower signed the Purchase and Sale
Agreements with GWA, which belies any claim that concealment of the Kuhn offers induced
him to enter these agreements.[27]

As for the third alleged misrepresentation, the Sellers assert that on October 27, 2021,
Ghadban made false statements to Brower about the consequences of not signing GWA's
Agreements after executing a Letter of Intent with GWA, specifically that GWA would sue him
to force his compliance with the Letter of Intent, which would tie up the Brower property, and
that he could lose his guardianship over his mother.  The record reflects a genuine dispute of fact
as to whether Ghadban actually made these statements, with Brower averring to those threats in
his declaration and deposition, while Ghadban denies making them.  Given the factual dispute in
the record, the Sellers are not entitled to summary judgment on this theory of fraudulent
inducement.

Nevertheless, even if Ghadban had made these statements to Brower, his reliance on
them must have been "reasonable and justified."  Hitachi Credit Am. Corp. v. Signet Bank, 166

---

[27] In addition, the Sellers argue that Ghadban concealed the Kuhn offers for the purpose of
procuring the Purchase and Sale Agreements with GWA, because "she saw an opportunity to
capitalize on the relationship with [p]laintiff and receive additional commission by acting as its
broker so that [p]laintiff could acquire more property for the Digital Gateway."  [Dkt. No. 134]
at 25.  The facts before the Court do not support this theory, as the record shows that Ghadban
only began representing and receiving a commission from GWA in the spring of 2022, many
months after Brower signed GWA's Purchase and Sale Agreements.

F.3d 614, 629 (4th Cir. 1999).  "The touchstone of reasonableness is prudent investigation," and

"[a] plaintiff cannot claim that its reliance was reasonable and justified when it makes a partial

inquiry, with full opportunity of complete investigation, and elects to act upon the knowledge

obtained from the partial inquiry."  Id.  Courts have concluded that it is not reasonable for a party

to a contract to "rely on oral statements that are contradicted by the plain terms of the written

agreement."  Design & Prod., Inc. v. Am. Exhibitions, Inc., 820 F. Supp. 2d 727, 741 (E.D. Va.

2011); Foremost Guar. Corp. v. Meritor Sav. Bank, 910 F.2d 118, 125-27 (4th Cir. 1990);

Fransmart, 768 F. Supp. 2d at 866-67 (finding that a fraud in the inducement claim failed

because the plaintiff "could not reasonably rely on oral statements that are contradicted by the

plain terms of the [a]greement").  Even though the GWA Letter of Intent that Brower signed

required him to negotiate in good faith, the letter clearly stated that it "does not constitute[] a

binding agreement[.]" [Dkt. No. 134-8] at 10.

Brower responds that notwithstanding the terms of the GWA Letter of Intent, it was

reasonable for him to rely on Ghadban's alleged statements because she served as his broker and

owed him fiduciary duties.  Although the Fourth Circuit has recognized that the existence of a

fiduciary relationship between parties is one of several factors in determining whether reliance

was reasonable, see Foremost Guar. Corp., 910 F.2d at 123-25, it is only one of several factors in

a fact-specific inquiry and is not dispositive.

Even construing the record most favorably to the Sellers, Brower has failed to show that a

reasonable jury could find that it was reasonable for him to rely on the alleged statements made

by Ghadban that he had to sign a contract with GWA pursuant to the letter of intent.  Even

though Ghadban owed Brower fiduciary duties as his broker, the undisputed record reflects that

after Brower signed the GWA Letter of Intent, which stated it was not binding, Ghadban took

steps to inform Brower of the competing Kuhn offer. It is also undisputed that Brower participated in a meeting with Ghadban and Kuhn on September 10, 2021, during which Ghadban stated that the assemblage sellers would engage in "competitive bidding" with GWA, [Dkt. No. 138-6] at 20, and Brower later received the Final Kuhn Letter of Intent from Ghadban, who included a comparison of that letter with the GWA Letter of Intent. In light of Ghadban's conduct affirming the consideration of competing offers in Brower's presence, the mere existence of a fiduciary relationship does not make it reasonable for Brower to have relied on alleged statements by Ghadban that he was required to sign a contract with GWA, when the Letter of Intent clearly provided otherwise. Because the Sellers have failed to make a sufficient showing on this theory of fraudulent inducement, it also fails.

For these reasons, the Broker's Motion will be granted as to Counts I and II of the Third-Party Complaint, and the Sellers' Second Motion will be denied as to these counts.

### 2. Breach of Fiduciary Duty (Count III)

Count III of the Third-Party Complaint alleges that Ghadban breached her fiduciary duties to the Sellers as their broker, for which they seek to recover $4,612,615 in compensatory damages, representing the difference between the price per acre offered by GWA and Kuhn, as well as forfeiture of Ghadban's right to compensation under the Listing Agreement and recovery of the attorney's fees and costs expended in this lawsuit.

"Under Virginia law, the elements of a cause of action for breach of fiduciary duty are: (1) a duty; (2) a breach; and (3) loss or damage caused by the breach." Grenadier v. BWW L. Grp., No. 1:14cv827 LMB/TCB, 2015 WL 417839, at *8 (E.D. Va. Jan. 30, 2015), aff'd, 612 F. App'x 190 (4th Cir. 2015) (citing Carstensen v. Chrisland Corp., 442 S.E.2d 660, 666 (Va. 1994)). "A fiduciary relationship exists where a party vests the other party with significant discretion in the management of affairs on its behalf." Id.

45

It is undisputed that Ghadban owed a fiduciary duty to the Sellers as their real estate broker.  In Virginia, it is "well settled that a real estate broker occupies a fiduciary relation to his principal and so long as that relation continues is under a legal obligation, as well as a high moral duty, to give his principal loyal service."  Olson v. Brickles, 124 S.E.2d 895, 898 (Va. 1962); see Burruss v. Green Auction & Realty Co., Inc., 319 S.E.2d 725, 727 (Va. 1984).  A "broker who is guilty of a breach of his obligation to his principal is not entitled to compensation."  Olson, 124 S.E.2d at 898.

The Sellers argue that Ghadban breached her fiduciary duties in three ways.  First, by misrepresenting the value of Phase 1 in relation to the Phase 2, Ghadban created an "arbitrary difference," "failed to exercise ordinary care," and "acted in bad faith."  [Dkt. No. 134] at 20-21.  In response, the Broker maintains that Ghadban did not misrepresent the value of Phase 1 and Phase 2, because there is a substantial difference in value between the properties, and regardless, Brower was aware of the price difference before he signed the Purchase and Sale Agreements.

As discussed above, the Sellers have not pointed to sufficient facts to establish that Ghadban misrepresented the value of Phase 1, including her property, in relation to the Brower property, or otherwise acted arbitrarily or in bad faith.  In an attempt to create an inference of bad faith, the Sellers point out that in her deposition, Ghadban admitted she came up with the different prices for the phases on her own.  Id. at 21.  That fact does not establish that her valuation was arbitrary, without justification, or false.

The Sellers also argue that Ghadban admitted in her deposition that part of her property will be used for open space or parks, see [Dkt. No. 134-18] at 40-43, which they claim is evidence that her land is not actually more valuable than the Phase 2 properties because data centers "will be built on Browers' property, not Ghadban's property."  [Dkt. No. 134] at 21.

46

This argument fails because there is evidence in the record that the proposed use of part of her property for open space "came on around in" the fall of 2021 or in 2022 as part of negotiations with the County about the PWC Digital Gateway Project and those negotiations are ongoing. [Dkt. No. 134-18] at 42. That negotiations with the County led to the proposed use of Ghadban's property for open space does not support the conclusion that she acted dishonestly or in bad faith when she previously valued the Phase 1 and Phase 2 properties to market the assemblage to data center developers. Because the Sellers have failed to make a sufficient showing based on facts, not allegations, that Ghadban acted dishonestly, they are not entitled to summary judgment based on this theory.

Second, the Sellers contend that Ghadban breached her fiduciary duty to disclose to Brower all valuable offers within a reasonable amount of time—namely, the Updated Kuhn Letters of Intent—and as a result, he was denied material information that affected his decision to sign the GWA Letter of Intent in August 2021. In Virginia, a "broker owes his principal the duty to use utmost fidelity to him and must disclose to him all facts within the broker's knowledge which may be material to the transaction, or which might influence the principal in deciding upon a course of action." Burruss, 319 S.E.2d at 727; see Va. Code Ann. § 54.1-2131(A)(2)(c) (providing that a broker engaged by a seller "shall . . . [p]romote the interests of the seller by . . . [r]eceiving and presenting in a timely manner written offers and counteroffers to and from the seller and purchasers, even when the property is already subject to a contract of sale). Brokers who violate the duty to disclose forfeit their right to compensation. Owen v. Shelton, 277 S.E.2d 189, 192 (Va. 1981).

Although the Broker asserts that Brower knew about the initial Kuhn Letter of Intent because a copy was sent to his wife in May 2021, it is undisputed that Ghadban did not disclose

47

the Updated Kuhn Letters of Intent that she received between June 23 and July 15, 2021, which were material to the transaction as they offered a higher price per acre than the GWA Letter of Intent. Ghadban was obligated to disclose these revised offers to the Sellers, and by failing to do so, she breached her fiduciary duty. Nevertheless, the Broker argues that because those offers and the Final Kuhn Letter of Intent were later disclosed, the Sellers did not suffer any loss or damage from the breach and, moreover, waived any alleged breach by executing GWA's Purchase and Sale Agreements with full knowledge of the Kuhn offers. The Broker's argument is persuasive.

  To prevail on a claim for breach of fiduciary duty, a plaintiff must prove that loss or damages were proximately caused by the breach. Carstensen, 442 S.E.2d at 666; see Saks Fifth Ave., Inc. v. James, Ltd., 630 S.E.2d 304, 311-12 (Va. 2006) (observing that a plaintiff is "entitled to recover damages that were the direct and proximate result" of a breach of fiduciary duties, but concluding that the plaintiff failed to show that the alleged damages "corresponded to the [d]efendants' wrongful conduct" and therefore "failed to show the necessary factor of proximate causation and thus did not carry its necessary burden of proof as to damages"). "A proximate cause of an event is that 'act or omission which, in natural and continuous sequence, unbroken by an efficient intervening cause, produces the event, and without which that event would not have occurred.'" Sugarland Run Homeowners Ass'n v. Halfmann, 535 S.E.2d 469, 472 (Va. 2000) (quoting Beale v. Jones, 171 S.E.2d 851, 853 (1970)). Although proximate causation is generally a "question of fact to be resolved by a jury . . . , when reasonable people cannot differ, the issue becomes a question of law for the court to decide." Id.

  The Sellers assert that Ghadban's failure to disclose the Updated Kuhn Letters of Intent caused them loss or injury, specifically that concealment of those offers led Brower to reject the

final Kuhn offer and enter into a binding agreement with GWA; however, the Sellers cannot prevail on this theory due to a lack of proximate causation.

As the Broker points out, it is undisputed that, although the terms of the Updated Kuhn Letters of Intent were not disclosed when they were initially received by Ghadban and were not disclosed to the Sellers before they signed the Letter of Intent with GWA on August 22, 2021, she did disclose them by September 7, 2021, when Ghadban, Wiley, and Brower met to discuss the offers. Brower and Ghadban subsequently discussed the offers in a meeting with Kuhn on September 10, 2021, during which Kuhn was asked to provide his "best and final" offer. The alleged breach—Ghadban's failure to disclose the Updated Kuhn Letters of Intent when she received them—was therefore cured by the subsequent disclosures of the offers. Those offers were then superseded by the Final Kuhn Letter of Intent, which Ghadban sent to Brower on September 18, 2021, one day after she received it. All of these disclosures, as well as Kuhn's final offer, occurred a month before Brower rejected the final Kuhn offer by executing Purchase and Sale Agreements with GWA on October 27, 2021. Based on this record, no reasonable factfinder could conclude that Ghadban's failure to disclose the earlier Kuhn offers proximately caused Brower to reject the final Kuhn offer and sign GWA's Purchase and Sale Agreements.

The Sellers also appear to argue that the subsequent disclosures could not cure the breach because Brower had "already taken action on the initial deception, and thus placed himself in a place where he had no choice but to proceed." [Dkt. No. 144] at 6-7. Essentially, the Sellers argue that the subsequent disclosures came too late, as Brower had already signed the GWA Letter of Intent and believed, based on alleged threats made by Ghadban on October 27, 2021, that he could be sued and his property could be "tied up" if he did not follow through with

signing a binding contract.  As a result, he was compelled to sign the Purchase and Sale
Agreements with GWA.

This argument finds no support in the factual record.  The undisputed record shows that
between September 18, 2021, when Brower received the final Kuhn offer and October 27, 2021,
when he signed GWA's contract, Brower consulted third parties as he considered whether to sign
a binding contract with GWA, and he also participated in a conversation with Ghadban and Kuhn
about the competing offer from Kuhn.  Given this time period, the record does not support the
Sellers' claim that the Kuhn disclosures came so late such that Brower had no choice but to sign
a binding contract with GWA.

The Broker's most compelling argument for summary judgment on this issue is that the
Sellers waived any claim for breach of fiduciary duty by ultimately signing GWA's Purchase and
Sale Agreements, which Ghadban had brokered.  The Broker bases this argument primarily on
Olson v. Brickles, in which the Virginia Supreme Court held that "[e]ven if it be assumed that
the evidence was sufficient to sustain a finding that there had been a breach of duty by the
broker, the defendants waived such breach when, with full knowledge of all the circumstances,
they executed the final sales contract which confirmed the commission agreement."  124 S.E.2d
at 900.

The facts of Olson are similar to the dispute in this civil action.  Like the sellers in Olson,
Brower had full knowledge of the Broker's alleged breach—withholding the Updated Kuhn
Letters of Intent—and nonetheless chose to enter into binding Purchase and Sales Agreements
with GWA, which Ghadban had brokered.  The GWA Agreements reaffirmed the parties'
commission arrangement.  See [Dkt. No. 134-4] ¶ 19 (providing that "[u]pon each payment by
Purchaser to Seller pursuant to the Promissory Note, Seller shall remit to Broker ███████

██████ of such payment"). When Brower executed the Purchase and Sale Agreements, he not only had full knowledge of the undisclosed Kuhn offers, he had also participated in a meeting with Ghadban and Kuhn, knew of the Final Kuhn Letter of Intent, had consulted with third parties and counsel on the pending offers, and ultimately rejected Kuhn's offer. Based on Olson, the Sellers waived Ghadban's breach of the duty to disclose, and the Broker is entitled to judgment as a matter of law on this count.[28]

Finally, the Sellers claim that Ghadban breached her fiduciary duty by failing to disclose her representation of GWA and her "additional financial interest" in receiving a 1 to 3% commission for land purchases she brokered for GWA. [Dkt. No. 134] at 22. Under Virginia law, because a real estate broker occupies a fiduciary relation to the principal, "[a] broker cannot be the agent of both the buyer and the seller in the same transaction without the intelligent consent of both parties." Olson, 124 S.E.2d at 898.

Ghadban does not dispute that she represented GWA in three transactions to purchase land for the PWC Digital Gateway Project, but the record shows that Ghadban never represented both GWA and the assemblage sellers, including Brower, in the same transaction. Rather,

_____

[28] During oral argument, the Sellers' counsel represented that they had authority contradicting Olson on the waiver issue, citing to Holder v. Maaco Enterprises, 644 F.2d 310 (4th Cir. 1981), in which the Fourth Circuit observed that "mere affirmance of a contract does not imply a waiver of the right to sue for fraudulent misrepresentation." Id. at 312. Counsel argued that based on Holder, the Sellers did not waive their claims for fraud and breach of fiduciary duty by signing the Purchase and Sale Agreements. Holder does not apply here because it applied Maryland law, not Virginia law, and concluded that under Maryland law, waiver of a fraud claim could not be implied merely from a novation but rather the plaintiff also had to have knowledge of the fraudulent nature of the misrepresentations and the right to sue for fraud.

Brower's counsel also incorrectly represented that Judge O'Grady "adopted Holder" in Harrell v. Deluca, 590 F. Supp. 3d 941 (E.D. Va. 2022). In that case, Judge O'Grady merely cited Holder in explaining that the principle that "a party with knowledge of a claim for fraud cannot raise that claim when they enter into a subsequent agreement" has been "echoed in the holdings of the Fourth Circuit." Id. at 947. Therefore, Olson, a decision by the Virginia Supreme Court, controls as to the claims for breach of fiduciary duty.

Ghadban began serving as GWA's broker in the spring of 2022, several months after the assemblage sellers, including Brower, signed their respective Purchase and Sale Agreements with GWA. The Sellers do not point to any evidence disputing these facts.

Moreover, the Sellers have not established, with reference to the record, how Ghadban's subsequent representation of GWA adversely affected them. Instead, the Sellers allege in only a conclusory fashion that Ghadban had a financial conflict-of-interest, which motivated her to pressure Brower to execute the Purchase and Sale Agreements with GWA; however, Ghadban began representing GWA months after those contracts were signed. There is no evidence in this record that indicates, for example, that Ghadban was negotiating with GWA to be its broker while she was representing the Phase 1 and Phase 2 property owners in the transactions at issue in this litigation. Lacking any factual basis, this claim fails.

In sum, the Broker's Motion will be granted as to Count III of the Third-Party Complaint for breach of fiduciary duty, and the Sellers' Second Motion will be denied as to this count.

3. Breach of Contract (Count V)

Count V alleges three purported breaches of the Listing Agreement between the Broker and the Sellers. The Broker responds that Ghadban did not breach the Listing Agreements, and that, regardless of any breach, the Sellers waived any claims based on those alleged breaches.

First, the Sellers argue that the Broker breached the conflict of interest disclosure provision of the Listing Agreement, which provided that "the Broker shall seek to value Client's property as equivalent to all other Parcels in the Assemblage inasmuch as the assemblage required [sic] the full participation of all owners and all parcels." [Dkt. No. 134-2] ¶ 7. The Sellers contend that by marketing and ultimately selling the parcels in the assemblage in two phases with a price differential of ███████ per acre, Ghadban violated that provision. In response, Ghadban argues that she did not breach the Listing Agreement, because the agreement

only provided that she "shall seek to value" all the properties as equivalent, but does not require that the prices obtained actually be the same, and that she determined that there were legitimate reasons for offering the Phase 1 and Phase 2 properties at different prices.

The Broker's interpretation of the Listing Agreement is sound. The language of the Listing Agreement is unambiguous in that it only requires the Broker to "seek" to value the assemblage properties at an equivalent price, which means "[t]o go in search or quest of," "to ask for," or "to make an attempt." See Oxford English Dictionary (2d ed.); Merriam-Webster's Unabridged Dictionary (last accessed Dec. 21, 2022). As the Virginia Supreme Court has explained, "[w]ords that the parties used are normally given their usual, ordinary, and popular meaning. No word or clause in the contract will be treated as meaningless if a reasonable meaning can be given to it, and there is a presumption that the parties have not used words needlessly." City of Chesapeake v. States Self-Insurers Risk Retention Grp., Inc., 628 S.E.2d 539, 578 (Va. 2006) (quoting D.C. McClain, Inc. v. Arlington Cnty., 452 S.E.2d 659, 662 (Va. 1995)). The Sellers' interpretation of the Listing Agreement would read "seek" out of the contract. As such, the contract did not require that Ghadban ultimately value the Phase 1 and Phase 2 properties equivalently; however, there is a genuine factual dispute as to whether Ghadban sufficiently attempted to value the properties at an equivalent price. The Sellers contend that after they signed the Listing Agreement with Brower in August 2020, Ghadban "immediately turned around" and sought a lower price for the Phase 2 properties of which the Brower property was a part, while valuing the Phase 1 properties, which included her properties, at a higher value. See [Dkt. No. 138] at 16; [Dkt. No. 134-24] at 11-12. Based on the offers she considered, Ghadban appears to have marketed Phase 1 and Phase 2 at different prices as early as November 2020, only a few months after Brower signed the Listing Agreement.

Notwithstanding any factual dispute over whether Ghadban fulfilled her obligation to "seek" equivalent values for the properties, as the Broker correctly argues and the undisputed record establishes, the Sellers waived any breach of contract claim based on the marketing of the Phase 1 and Phase 2 at different prices. Under Virginia law, waiver involves the "intentional relinquishment of a known right," and "both knowledge of the facts basic to the exercise of the right and the intent to relinquish that right are essential elements" of waiver, which must be proven by the party asserting waiver "by clear, precise, and unequivocal evidence." Stanley's Cafeteria, Inc. v. Abramson, 306 S.E.2d 870, 873 (Va. 1983) (internal quotations omitted). A party may waive a right "expressly, either in writing or by parol, and impliedly by inconsistent conduct." RMBS Recovery Holdings, I, LLC v. HSBC Bank USA, N.A., 827 S.E.2d 762, 769 (Va. 2019) (internal quotations omitted). Silence, inaction, or passive acquiescence on the part of the complaining party may, where there is a duty to speak, result in waiver or estoppel. See id.; Schulze v. Kwik-Chek Realty Co., Inc., 181 S.E.2d 629, 630 (Va. 1971). Although "the failure to protest or object . . . is an element of waiver," it "does not itself constitute waiver" absent a showing of an intentional relinquishment of a known right. Stanley's Cafeteria, 306 S.E.2d at 874 (quoting May v. Martin, 137 S.E.2d 860, 864 (Va. 1964)).

The uncontested facts before the Court establish that Brower waived his contractual right for Ghadban to "seek to value [the Brower] property as equivalent" to the Phase 1 properties. [Dkt. No. 134-2] ¶ 7. It is undisputed that, as early as February 2021, six months after the Listing Agreement was executed on August 19, 2020, Brower was aware that Ghadban was marketing Phase 1 and Phase 2 at different prices, and that subsequent communications from Ghadban to the assemblage sellers disclosed the price differential. For example, in her July 25, 2021 Confidential Update, Ghadban mentioned her negotiations with GWA and that she had

54

proposed a price of ▮▮▮▮▮ per acre for Phase 1 and ▮▮▮▮▮ per acre for Phase 2.  Brower

also knew that Ghadban owned property in Phase 1, which she was selling as part of the

assemblage, as her ownership was disclosed in the Listing Agreement. There is no evidence in

the record that, after February 2021, when Brower knew of the price differential, he

communicated any objections or concerns to Ghadban about the price differential. [29]  Because

Ghadban was marketing the Sellers' property on their behalf, they had a duty to speak, and when

they did not protest, it was reasonable for Ghadban to have relied on their continued silence as

acquiescence in the price differential.

Not only did the Sellers fail to object, Brower also took actions that evince his consent to

the price differential and his intent to relinquish his right for Ghadban to seek to value the

properties equivalently.  On August 29, 2021, while represented by counsel, Brower signed the

GWA Letter of Intent, which expressly disclosed the different purchase prices for Phase 1 and

Phase 2, and after consulting with third parties, on October 27, 2021, he signed the Purchase and

Sale Agreements knowing that the price the Sellers would receive would be lower than the price

being offered for the Phase 1 properties.  Brower's inaction, failure to protest the price

differential, and affirmative conduct are all sufficient to establish waiver.

The Sellers try to argue that waiver does not apply because of Ghadban's "intervening

fraud" and "tortious conduct."  [Dkt. No. 138] at 17-19.  This argument fails because, as

previously explained, they have not established that Ghadban committed fraud by

---

[29] The Sellers maintain that Brower "protested . . . [the] breaches to no avail because Ghadban convinced Brower to trust her," pointing to Brower's deposition transcript.  [Dkt. No. 138] at 18. The record cited by the Sellers shows only that Brower testified in his deposition that he "questioned [Ghadban] why the difference," she explained the difference to him, and he "trusted her" because "[s]he's my broker, and that he "didn't question her any further than [t]hat." [Dkt. No. 138-8] at 33-34.  This record does not establish that Brower actually protested the price differential.

misrepresenting the difference in value between the Phase 1 and Phase 2 properties. In sum, the language of the Listing Agreement is clear that Ghadban was only required to attempt to value Phase 1 and Phase 2 equivalently, and the Sellers waived any breach of contract claim based on that provision of the Listing Agreement when Brower signed GWA's Purchase and Sale Agreements.

Second, the Sellers argue that Ghadban breached the Listing Agreement by marketing the assemblage properties with a contingency that all sellers would donate ███ per acre of their sales proceeds to the Pageland Philanthropic Foundation, which would result in the Sellers receiving less than ███ per acre. The Sellers point out that the Listing Agreement provided that the "[p]urchase [p]rice for the [p]roperty shall be determined by a survey based on the asking price of not less than ███ per acre, unless a signed consent is signed by Seller for the sale of the property." [Dkt. No. 134-2] ¶ 3(A). The Sellers contend that subtracting ███ per acre for the donation from the contract price of ███ per acre results in a price of ███ per acre in violation of the Listing Agreement. In response, Ghadban argues that she marketed the Brower property with an asking price of ███ per acre, which is unaffected by the assemblage sellers' agreement to donate a portion of the sales proceeds to a foundation.

The Broker has the better argument. The Listing Agreement is unambiguous and provides that the purchase price shall be determined based on an "asking price of not less than ███ per acre." Id. There is no evidence in the record that shows that during their negotiations, Ghadban ever offered GWA or any other potential buyer a per acre price below ███. A provision of the Purchase and Sale Agreements requiring that the Sellers donate a portion of their sales proceeds does not affect the "asking price" but only impacts their net proceeds. Importantly, the Listing Agreement does not state that the purchase price shall be

56

determined based on "net proceeds" of ████ per acre.  Therefore, Ghadban did not breach the Listing Agreement by brokering a contract with GWA that provided for a philanthropic donation of a portion of the sales proceeds.  Again, waiver would apply here because by signing the GWA Agreements, Brower agreed to the lower net receipt.

Finally, the Sellers argue that Ghadban breached the Listing Agreement by fraudulently inducing Brower to enter into GWA's Purchase and Sale Agreements and by violating her fiduciary duties arising out of the Listing Agreement when she did not disclose all valuable offers to Brower.  As previously discussed, there is no merit to the Sellers' claims of fraudulent inducement and breach of fiduciary duty, which therefore cannot support a breach of contract claim.

For these reasons, the Broker's Motion will be granted as to Count V of the Third-Party Complaint for breach of contract, and the Sellers' Second Motion will be denied as to this count.

### 4. Declaratory Judgment (Count VIII)

Even though the Third-Party Complaint seeks a judgment "declaring that the Pageland Purchase Agreement and Brower Purchase Agreement are voidable due to illegality, fraud, and/or duress," [Dkt. No. 36] ¶¶ 100-01, in the Sellers' Second Motion, they do not seek to void these Agreements.  Rather, they seek a declaration that Ghadban and MagLandBroker "breached the listing agreement and their fiduciary duties, and fraudulently induced [the Sellers] to enter the purchase agreements."  [Dkt. No. 134] at 27-28.  As the Broker correctly points out, the Sellers are now seeking declaratory relief which they did not plead in the Third-Party Complaint.  For that reason, the Sellers' Second Motion will be denied as to Count VIII of the Third-Party Complaint, and the Broker's Motion will be granted as to that count.  Moreover, because the Sellers' Second Motion will be denied as to the claims for breach of contract, breach of fiduciary duties, and fraud, there is no basis for the declaration requested in that motion.

## III. CONCLUSION

For the reasons stated above, by an Order to be issued with this Memorandum Opinion, Defendants Pageland LLC's and Barbara Brower's Motion to Dismiss Plaintiff GW Acquisition Co., LLC's First Amended Complaint or, in the Alternative, for Summary Judgment [Dkt. No. 122] will be granted as to Counts II, III, IV, VI, and VII of the First Amended Complaint and these counts will be dismissed, and denied as to Counts I and V; Plaintiff GW Acquisition, LLC's Motion for Summary Judgment [Dkt. No. 127] will be granted as to Counts I and V of the First Amended Complaint and denied as to Counts II, III, IV, VI, and VII; Third-Party Defendants' Motion for Summary Judgment [Dkt. No. 130] will be granted as to the Third-Party Complaint; and Third-Party Claim Plaintiffs Pageland LLC, Barbara Brower, and Jon Sanders Brower's Motion for Summary Judgment as to Third-Party Defendants MagLandBroker, LLC and Mary Ann Ghadban [Dkt. No. 133] will be denied as to the Third-Party Complaint.

As a result, judgment will be entered in the plaintiff's favor on Counts I and V of the First Amended Complaint, in defendants' favor on all other counts of the First Amended Complaint, and in third-party defendants' favor on the Third-Party Complaint.

Entered this 6th day of January, 2023.

Alexandria, Virginia

_____ /s/

Leonie M. Brinkema
United States District Judge